[No. 21917–1–I.   Division One.   July 17, 1989.]

THE STATE OF WASHINGTON, *Respondent*, v. WADELIN
LEROY DRUMMER, *Appellant*.

*Paris K. Kallas,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Kathryn Goater, Deputy,* for respondent.

Forrest, J.—Wadelin Leroy Drummer appeals from his conviction of felony murder in the first degree and from his exceptional sentence of 660 months. We affirm.

On the afternoon of July 22, 1987, Norman Gould, age 63, approached his neighbors, Wadelin Leroy Drummer and Larry Drummer, and asked whether they would like to earn some money by helping him fix his van. During and after the repairs to the van, Gould and Wadelin Drummer drank. They were last seen together at 10 p.m. Another neighbor saw Gould park the van behind his house and go in the house alone.

At approximately 2 a.m., one of Wadelin's housemates, Willie Smith, went to use the bathroom. Wadelin was already there, and he told Smith that he had been in a

"tussle" with Gould and had stabbed him to death. Smith did nothing and went back to bed.

A friend of Gould stopped by the house at 10:40 the next morning and noticed that the van was parked out front, that the door to the house was open, but that Gould did not appear to be home. Two other friends stopped by the house at 1 p.m. as previously arranged. They noticed that the van was not there, but that the door to the house was open. After checking the neighborhood, they entered the house and found Gould's body on his bed. He had been beaten and stabbed to death. The police were notified. A blood–covered rag and baseball bat were found in the house. Gould's empty wallet was found between the mattress and box springs. In addition, stolen property, including tools and stereo equipment, was found in the house.

Both Wadelin's and Larry's fingerprints were found in the house. Upon their return from abroad, Gould's housemates verified that a number of items had been taken from the house, including suits, guns and jewelry, including a jade elephant. They said they were unaware of how the stolen tools and stereo equipment ended up in the house.

The day after the murder, Larry was observed trying to sell a bag of jewelry, including a jade elephant, and Wadelin was observed trying to dispose of two suits that he had told Smith were taken from Gould's house. That day, Wadelin told one of his housemates, Janice Scoby, that Gould was dead. A witness also saw Larry and his sister driving a van, knowing that neither owned a van.

A few days later, Wadelin was visiting his girl friend, April Cordray, in Spokane. Upon being asked what was bothering him, Wadelin told Cordray that he and an unidentified woman had tried to rob a man and in the process killed him. Wadelin also said that the woman hit the victim across the legs with a baseball bat. He said that the victim was an old white man who lived around the corner, that the victim had told him he would rather die than give up his money, and that he stabbed the victim. Some weeks later, Cordray contacted law enforcement authorities and

recounted Wadelin's statements. Just before trial, Cordray signed an affidavit recanting her statements to police. However, after being appointed a lawyer, she retracted the affidavit and testified at trial in accordance with her original statement. Defense counsel vigorously challenged her veracity at trial.

Wadelin was arrested after Cordray notified the police. He was carrying a folding knife at the time of arrest, which was found to have type O human blood in the handle. Gould had type O blood. Wadelin and Larry were charged with felony murder in the first degree, with robbery as the underlying felony. Wadelin was found guilty as charged. Larry was convicted of the lesser included offense of robbery in the second degree and sentenced to 9 months in the county jail. Wadelin's offender score was determined to be seven, based on FBI rap sheets, producing a standard range of 338 to 450 months. Wadelin was given an exceptional sentence of 660 months, after the court found that the crime was aggravated because of Gould's particular vulnerability and because of Wadelin's deliberate cruelty in the commission of the crime.

### TRIAL ISSUES

Wadelin Drummer (Drummer) first argues that the court erred in excluding evidence he wished to present, which he asserted implicated others in Gould's death. He made an offer of proof to present hearsay evidence that: (1) David Holland had burglarized Gould, which resulted in Gould beating up Holland and Holland threatening to kill Gould on a number of occasions; (2) Gould attempted to borrow money from a person because he "was in deep shit with some black guys" who had threatened to kill him; and (3) two white men had been looking for Gould and that Gould said he was going to kill one of the men. He also sought to introduce evidence that Gould was fencing stolen property out of the house. He contends that the refusal of the offer of proof denied him his fundamental constitutional right to have the jury hear his side of the story citing *Taylor v.*

*Illinois.*[1] He further asserts that the court improperly relied on *State v. Kwan*[2] and *State v. Downs*[3] in excluding the evidence of other suspects, because *Kwan* and *Downs* have lost their vitality and are contrary to more recent cases.

Contrary to Drummer's position, *Taylor* specifically states that a criminal defendant "does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."[4] It simply required the trial court to examine the reasons for a defendant's failure to comply with discovery rules before imposing a discovery sanction that entirely excludes the testimony of a material defense witness. Drummer failed his burden of showing that the evidence implicating other suspects was relevant and material in the absence of any direct linkage to the facts of the crime.[5] *Kwan* and *Downs* are accurate statements of the reasons for limiting evidence of other suspects to a crime when no showing of relevance or materiality has been made. The proffered evidence is not relevant to rebut the evidence presented against Drummer. It was offered solely to encourage the jury to speculate as to possible other assailants. Evidence of Gould's state of mind is also irrelevant. Drummer's defense was identity, not accident or self-defense. The denial of Drummer's offer of proof was proper.

Drummer's second argument is that the admission of photographs from Gould's autopsy was an abuse of discretion because they were gruesome and were not probative. The photographs included two of Gould's head, three of his

---

[1] 484 U.S. 400, 98 L. Ed. 2d 798, 108 S. Ct. 646 (1988).

[2] 174 Wash. 528, 533, 25 P.2d 104 (1933).

[3] 168 Wash. 664, 668, 13 P.2d 1 (1932).

[4] 108 S. Ct. at 653.

[5] *State v. Pacheco,* 107 Wn.2d 59, 67, 726 P.2d 981 (1986).

legs and feet, two of his hands, and one of his chest. Drummer argues that the photographs lack probative value because his defense is identity, not self–defense or justifiable homicide.

The photographs were relevant and probative of the State's theory that at least two persons had to have been involved to inflict Gould's injuries and that Gould had been tortured to reveal the location of his money before his death. Further, they show that Gould's injuries corroborate Drummer's statements to Cordray in Spokane. After review, the photographs, while graphic, are not so gruesome as to inflame the emotions of the jurors. The admission of the photographs into evidence was not an abuse of discretion.[6]

### Sentencing Issues

Drummer's third argument is that the court improperly determined his offender's score to be seven. Drummer claims that the trial court improperly considered FBI rap sheets in computing his criminal history instead of certified copies of his out–of–state convictions. *In re Sinka;*[7] *In re Bush.*[8] *In re Sinka* is inapposite, as it merely requires the parole board to disclose certain information to an inmate and says nothing about the use of disclosed FBI rap sheets. *In re Bush, supra,* does contain a requirement that the parole board, as a part of minimal due process, "obtain certified copies of the judgment and sentence."[9] In making its ruling, the court analogized the parole board's requirements as to out–of–state convictions in enhancing a sentence with court requirements in former habitual criminal

---

[6]*State v. Crenshaw,* 98 Wn.2d 789, 806, 659 P.2d 488 (1983); *State v. Sargent,* 40 Wn. App. 340, 347, 698 P.2d 598 (1985).

[7]92 Wn.2d 555, 599 P.2d 1275 (1979).

[8]26 Wn. App. 486, 616 P.2d 666 (1980), *aff'd,* 95 Wn.2d 551, 627 P.2d 953 (1981).

[9]26 Wn. App. at 496.

proceedings. We decline to apply a similar rule in the routine sentencing proceedings under SRA, because an evidentiary hearing is provided if the convictions are in dispute, RCW 9.94A.370(2).

The FBI rap sheet submitted to the sentencing judge was supported by affidavits from officers of the FBI and the State Patrol as to the procedures used to insure the identity of the defendant in the listed convictions with the defendant before the court. The defendant was fully advised of the asserted convictions and the rap sheet was before him for examination. No challenge was made to the contents of the report nor to any specific conviction utilized by the trial judge. Drummer's contention was that as a matter of evidence the court could not consider the report and must have certified copies of the judgment and sentences reflected therein. We disagree. The rap sheets are admissible as "Public Records and Reports". ER 803(a)(8); *State v. Monson.*[10] In the absence of any challenge to the accuracy of the rap sheet and in the presence of the supporting affidavits, the court committed no error.

However, we do not accept the State's contention that generic affidavits of FBI and State Patrol officials which discuss the procedures used to match arrest and conviction information to an individual's rap sheet are sufficient to prove a defendant's criminal history in all cases. If Drummer had challenged the accuracy of the information as to specific convictions, reliance on the rap sheet alone in the absence of full evidentiary hearing might have constituted error. No hearing pursuant to RCW 9.94A.370(2) was required here because the issue was the court's right to consider the rap sheet, not its accuracy. *Accord, State v. Franklin;*[11] *see also* D. Boerner, *Sentencing in Washington* 6–14 to 6–15 (1985).

[10] 53 Wn. App. 854, 771 P.2d 359 (1989).

[11] 46 Wn. App. 84, 86, 729 P.2d 70 (1986), *rev'd on other grounds sub nom. State v. Dunaway,* 109 Wn.2d 207, 217, 743 P.2d 1237, 749 P.2d 160 (1987).

Drummer's fourth argument is a challenge to the findings made in support of his exceptional sentence on the grounds that they are not supported by the record. Two grounds are stated by the trial judge. First, the court found that, "[t]he victim was particularly vulnerable, being 63 years of age and attacked and murdered in the sanctity of his own home in the middle of the night." Second, the court found that Drummer manifested "deliberate cruelty" because Gould was "tortured prior to being killed", was hit with a baseball bat several times over the legs and several times in the head, was cut on the head and shoulders 20 times, and was fatally stabbed in the neck and chest.

■ A sentencing judge's reasons for imposing an exceptional sentence will be upheld unless they are "clearly erroneous" or do not justify an exceptional sentence as a matter of law.[12]

The first finding is based on RCW 9.94A.390(2)(b),

> The defendant knew or should have known that the victim of the current offense was particularly vulnerable or incapable of resistance due to extreme youth, advanced age, disability, or ill health.

The victim's age of 63 does not constitute "advanced age" especially in light of the evidence that the victim was a vigorous robust man (*e.g.*, a recent photo of him doing a handstand, involved in physical fights, his telling a witness that he had "beat up" a 20–year–old male). Although there was evidence of intoxication, there was no showing that he was incapable of resistance, even giving a broad reading to the resistance factor listed in the statute. Finally, the court relied on the location of the murder in the victim's own bed. If this fact is to be considered, it is by virtue of court decision and not any language in the statute. The State cites *State v. Ratliff*.[13] The case does not support the reason. In *Ratliff*, there had been a long course of harassment

---

[12]*State v. McAlpin,* 108 Wn.2d 458, 462–63, 740 P.2d 824 (1987).

[13]46 Wn. App. 466, 731 P.2d 1114 (1987).

of the victim which continued after the victim had moved to a new residence for protection. Under these facts the court found, "an invasion of [her] private life",[14] as a legitimate aggravating factor. Being murdered in your own home is not per se an aggravating factor.[15] The findings are supported by the record but do not singly or collectively satisfy subsection (2)(b), nor do they independently constitute a basis for an exceptional sentence. Accordingly, the first ground that the victim was "particularly vulnerable" is erroneous as a matter of law.

RCW 9.94A.390(2)(a) identifies "deliberate cruelty to the victim" as an aggravating factor. The injuries and torture inflicted on the victim abundantly justify the factual finding of deliberate cruelty which as a matter of law justifies an exceptional sentence. Drummer's assertion that deliberate cruelty is encompassed in first degree murder is incorrect. He was charged with felony murder in the first degree with robbery as the underlying felony. The multiple injuries and torture inflicted on Gould are in no way encompassed in felony murder.

Drummer's final contention is that even if an exceptional sentence is proper, 660 months is clearly excessive, especially when compared with the 9–month sentence received by Larry Drummer. Once proper grounds for an exceptional sentence are established, the length of the sentence is reviewed for abuse of discretion. *State v. Oxborrow*.[16] Drummer has not made a showing for an abuse of discretion. The standard range was 338 to 450 months,

---

[14] 46 Wn. App. at 470.

[15] The only other decision employing an invasion of the victim's "zone of privacy", *State v. Falling*, 50 Wn. App. 47, 55, 747 P.2d 1119 (1987), is similarly inapposite. It recognizes that a rape occurring in the victim's bedroom causes added psychological trauma, and is therefore aggravated.

[16] 106 Wn.2d 525, 530–31, 723 P.2d 1123 (1986).

making the exceptional sentence only 1.5 times the maximum of the standard range. There was no abuse of discretion in the length of the sentence.

■ Where the sentencing judge has given both proper and improper grounds for imposing an exceptional sentence, this court may affirm rather than remand when we are satisfied that the judge would have imposed the same sentence absent the improper factor. *State v. Tunell.*[17] The deliberate cruelty was plainly the decisive and crucial motivating factor in the judge's determination of the appropriate sentence. We have no doubt that the same sentence would be imposed absent the finding of particular vulnerability.

The judgment of conviction and the exceptional sentence are affirmed.

GROSSE, A.C.J., and WEBSTER, J., concur.

[17]51 Wn. App. 274, 284, 753 P.2d 543, *review denied,* 110 Wn.2d 1036 (1988).