[No. 12439-4-II.   Division Two.   May 8, 1990.]

THE STATE OF WASHINGTON, *Respondent*, v. YVONNE E. WOOD, *Appellant*.

*Kevin B. McGoffin* and *McGoffin & McGoffin,* for appellant (appointed counsel for appeal).

*John W. Ladenburg, Prosecuting Attorney,* and *Kitty–Ann Van Doorninck, Deputy,* for respondent.

WORSWICK, J.—Yvonne Wood appeals convictions and sentences for murder in the first degree (RCW 9A.32.030-(1)(a)), and conspiracy to commit murder in the first degree. RCW 9A.28.040; RCW 9A.32.030(1)(a). She contends that the trial court erred by admitting the out–of–court statements of Joseph Tigano, finding witness Robert Poli competent to testify, and imposing an exceptional sentence. We affirm.

Wood's husband, Richard, a 26–year–old Army lieutenant, was shot and killed at his home early on the morning of May 21, 1987. Sheriffs deputies were summoned at 2:05 a.m. by Wood, who said that she and her husband awoke to "prowler noise." According to Wood, her husband got up to investigate, she then heard "popping noises," and when her husband failed to respond to her call, she telephoned 911.

The officers found Richard Wood lying face up on the floor of the bedroom, naked, with bullet holes in his chest and neck and no pulse. Blood spatters on the floor and bed had already dried. The medical examiner later confirmed five entrance and four exit gunshot wounds, and he opined that it would have taken 30 minutes to an hour for the victim to die from bleeding. Investigators found no signs of forced entry. No weapon was discovered at the scene, and tests done on hand swabbings from Wood revealed nothing to indicate that she had fired a weapon.

Wood was the beneficiary of two life insurance policies on the victim's life, the total value of which was around $150,000. Wood had once commented to her husband, as he worked on the roof of their home with a friend, "I wish you'd fall off the roof and I can collect your life insurance money." Testimony at trial also revealed that Wood had been involved with several other men about the time of the murder, including one Joseph Tigano, an Army Ranger. Robert Poli and Shane Kretsinger, fellow Army Rangers, testified that Tigano enlisted them to help in killing Richard. Tigano told them that he and Wood would get $150,000 insurance money on Richard's death, and payment for the killing would be $15,000. Kretsinger testified to a

telephone conversation with Wood during which she identified herself, asked if Kretsinger would kill her husband for her, gave him a description of Richard, and agreed to send pictures of the proposed victim through Tigano. Kretsinger received the pictures within a week. When Poli and Kretsinger withdrew their assistance, Tigano announced that he would proceed without them.

On May 21, 1987, a few hours after Richard was killed, Tigano told Poli that Wood had left the back door unlocked for him and, "I got him five or six times. I unloaded my weapon into him." Tigano told Poli about a "groan" or "gurgling sound" that the victim made when a bullet hit him in the neck. Tigano also told Poli that he threw the gun from the Narrows Bridge. Kretsinger testified that Tigano described the same events to him. Further, the man who had been on desk duty at the Ranger barracks the night of the killing testified that Tigano took a call from his "girlfriend" about 10:30 or 11 p.m., left and then returned sometime between 1:30 and 3 a.m., "distressed," "flushed," and "worried."

Two more of Wood's paramours testified concerning her preoccupation with getting rid of her husband and pursuing other relationships. Matthew Gillen said that in the spring of 1987, he and Wood discussed possible ways of killing Richard Wood during telephone conversations from his post in the Pacific. John Gottfried testified that Wood had introduced herself to him in early 1987 as a general's daughter, that they had an affair, and that about 10 days after Richard was killed, he and Wood traveled to Missouri together so she could meet his family.

About 3 weeks after the murder, Tigano and Wood moved into a house in Spanaway together. According to Gottfried, Wood showed no remorse at the death of her husband. Kretsinger said that Wood often showed just the opposite, taunting Tigano with his sensitivity to the sound Wood made as he died, saying, "Hey, Joe. Gurgle, gurgle."

Tigano and Wood were both charged with aggravated first degree murder and conspiracy to commit murder in

the first degree, but their trials were severed. In pretrial rulings, the court denied Wood's motion to suppress Tigano's statements to Poli and Kretsinger. The court also refused Wood's request to order a psychiatric evaluation of Robert Poli to determine whether his prior drug use affected his competency to testify.

The jury acquitted Wood of aggravated first degree murder but convicted her of the lesser included offense of first degree murder and also of conspiracy to commit first degree murder. The court imposed an exceptional sentence.

Wood first asserts that the trial court erred in admitting Joseph Tigano's out-of-court statements to witnesses Kretsinger and Poli. She concedes that the statements met the requirements for admissibility under state law. *See State v. St. Pierre,* 111 Wn.2d 105, 759 P.2d 383 (1988); *State v. Anderson,* 107 Wn.2d 745, 733 P.2d 517 (1987); *State v. Edmondson,* 43 Wn. App. 443, 717 P.2d 784, *review denied,* 106 Wn.2d 1016 (1986). She contends, however, that *Coy v. Iowa,* 487 U.S. 1012, 101 L. Ed. 2d 857, 108 S. Ct. 2798 (1988), a more recent decision, bars such out-of-court statements for failure literally to comply with the face-to-face confrontation required by the Sixth Amendment. She is mistaken.

In *Coy,* the United States Supreme Court held that a statute permitting a screen to be erected between a defendant and a child sex-abuse witness violated the defendant's confrontation clause protections. The Court referred to "the irreducible literal meaning of the [confrontation] Clause: 'a right to *meet face to face* all those who appear and give evidence *at trial.*'" (Citations omitted). *Coy,* at 1021. The Court, however, distinguished this narrow literal right from rights that are "reasonably implicit" in the clause, such as the "right to exclude out-of-court statements", *Coy,* at 1020, stating that it will not make exceptions to the *literal* right but does recognize exceptions to the *implied* rights if the exceptions are "firmly . . . rooted in our jurisprudence." *Coy,* at 1021 (citing *Bourjaily v. United States,* 483 U.S. 171, 97 L. Ed. 2d 144, 107 S. Ct.

2775 (1987)). *Bourjaily* recognized the admissibility of coconspirator statements as "steeped in our jurisprudence", *Bourjaily,* at 183, and the Washington Supreme Court has cited *Bourjaily* in admitting coconspirator statements. *State v. St. Pierre, supra. See also Anderson,* 107 Wn.2d at 750–52; *Edmondson,* 43 Wn. App. at 448. Wood fails to appreciate the Supreme Court's distinction between the literal and implied protections of the Sixth Amendment confrontation clause. *Coy* did not disturb the admissibility of coconspirator statements such as Tigano's; such statements, along with other out–of–court statements that are firmly rooted exceptions to the hearsay rule, are still admissible.

We also find no error in the trial court's refusal to order a psychiatric evaluation of Robert Poli to determine whether prior drug use affected his competency to testify. Witness competency is to be determined by the trial court within the framework of RCW 5.60.050 and CrR 6.12(c),[1] and the court's determination will not be disturbed on appeal except for abuse of discretion. *State v. Froehlich,* 96 Wn.2d 301, 304, 635 P.2d 127 (1981). The trial court is especially cloaked with authority to judge whether a prosecution witness should be compelled to submit to a psychiatric examination. *State v. Stamm,* 16 Wn. App. 603, 605, 559 P.2d 1 (1976).

Here, the trial court entertained a lengthy voir dire on Poli's prior drug use. Then, by hearing all of Poli's testimony, the court had ample opportunity to observe Poli's perception, recall, demeanor, and ability to communicate. The court also permitted an offer of proof by the defense expert concerning possible effects of drug use such as Poli's.

---

[1]RCW 5.60.050 states: "**Who are incompetent.** The following persons shall not be competent to testify:

"(1) Those who are of unsound mind, or intoxicated at the time of their production for examination, and

"(2) Those who appear incapable of receiving just impressions of the facts, respecting which they are examined, or of relating them truly."

CrR 6.12(c) states in part: "**Persons Incompetent to Testify.** . . . (1) Those who are of unsound mind, or intoxicated at the time of their production for examination;"

After thoughtfully and thoroughly considering the issue, the court determined that Poli was competent to testify and that no expert testimony was needed. This determination was well within the court's discretion, which exists for the express purpose of preventing the issue of each witness's credibility from "engulf[ing] the prime inquiry of the trial." *Stamm,* 16 Wn. App. at 605.[2]

Finally, Wood challenges her exceptional sentence.[3] The trial court imposed concurrent terms of 552 months for the murder conviction and 480 months for the conspiracy conviction. The standard range for first degree murder is 240 to 320 months, and for the conspiracy conviction, 120 to 240 months.

Wood's first contention, that her federal and state constitutional due process guaranties were violated because she had no notice that the State would support an exceptional sentence, is quickly dispatched. No such notice is required. *State v. Falling,* 50 Wn. App. 47, 50, 747 P.2d 1119 (1987). *See also* D. Boerner, *Sentencing in Washington* § 9.19, at 9–58 (1985).

Wood also challenges the court's findings and conclusions supporting the exceptional sentences. She contends, essentially, that the facts were disputed, constituted elements of the crimes charged, or were unsupported by the record. We disagree. The findings are supported by the record, they, in turn, support the conclusions, and the conclusions support the sentences.

The court may impose a sentence outside the standard range for the offense if, considering the purpose of the sentencing reform act, there are substantial and compelling reasons justifying an exceptional sentence. RCW 9.94A-.120(2). A purpose of the act is to protect the public, and

---

[2]We have considered other issues raised by Wood concerning Poli's testimony and find them without merit.

[3]Wood does not claim that the sentence is clearly excessive, and we do not consider that possibility. *See State v. Nordby,* 106 Wn.2d 514, 517, 723 P.2d 1117 (1986).

the overriding purpose is to ensure punishment proportionate to the offense. RCW 9.94A.010(1), (4); *State v. Payne*, 45 Wn. App. 528, 532, 726 P.2d 997 (1986).

Appellate review of an exceptional sentence is governed by RCW 9.94A.210(4):

> To reverse a sentence which is outside the sentence range, the reviewing court must find: (a) Either that the reasons supplied by the sentencing judge are not supported by the record which was before the judge or that those reasons do not justify a sentence outside the standard range for that offense; or (b) that the sentence imposed was clearly excessive or clearly too lenient.

The sufficiency of the evidence, the sufficiency of the reasons, and the excessiveness or leniency of the exceptional sentence are measured by the clearly erroneous, matter of law, and abuse of discretion standards, respectively. *State v. Dunaway*, 109 Wn.2d 207, 218, 743 P.2d 1237, 749 P.2d 160 (1987); *State v. Creekmore*, 55 Wn. App. 852, 860, 783 P.2d 1068 (1989), *review denied*, 114 Wn.2d 1020 (1990).

Here, the trial court expressed the following reasons for the exceptional sentence in its conclusions of law: (1) Wood's total indifference and lack of remorse at the death of her husband as expressed by her traveling to Missouri with Gottfried just 1 week after the murder and her establishing a residence with Tigano just three weeks after the murder; (2) her sophistication and planning as evidenced by the fact that she discussed plans to kill her husband over a long period of time (about a year), and that she discussed the plans with several people other than Tigano; (3) future dangerousness because of her ability to manipulate people.[4]

---

[4]This "future dangerousness" reason is a finding of fact that is erroneously denominated a conclusion of law. Conclusion of law 6 reads: "The defendant poses a danger to society because of her manipulation of many people, and if released to society with her current mental state, she would be a menace to society." A finding erroneously labeled a conclusion of law is reviewed as a finding of fact. *Willener v. Sweeting*, 107 Wn.2d 388, 730 P.2d 45 (1986).

■ The court's reasons are certainly not clearly erroneous; they are, in fact, all amply supported by the record. Testimony concerning Wood's actions and statements following her husband's murder reflect her total indifference to his death. Evidence regarding her frequent and widespread discussions plotting the murder show extensive planning. Finally, the record shows that Wood has an extraordinary ability to infatuate men on brief acquaintance, to the extent that she can convince them to consider killing on her behalf. In short, she displays a high degree of criminal sophistication. The remaining question is whether the reasons support the exceptional sentence. We hold that all but one of the reasons were sufficient.

■ Lack of remorse has been recognized as an aggravating circumstance justifying an exceptional sentence. *Creekmore,* 55 Wn. App. at 860–62; *State v. Ratliff,* 46 Wn. App. 466, 470, 731 P.2d 1114 (1987). We associate ourselves in general with the courts that have so held, but we do not believe that the mundane lack of remorse found in run–of–the–mill criminals is sufficient to aggravate an offense. Therefore, we add the qualification that lack of remorse, to be an aggravating circumstance, must be of an aggravated or egregious character. Whether this quality is present in a given case will depend on the facts; it certainly was present here, as it was, for example, in *Creekmore.*

■ Wood contends that her lack of remorse was disputed by testimony on her behalf at the sentencing hearing, so the court was precluded by RCW 9.94A.370(2) from considering it as a factor without granting an evidentiary hearing. We disagree. The sentencing hearing provided an opportunity for testimony on Wood's behalf equal to what would have been provided by a formal evidentiary hearing, and the court heard the same testimony it would have heard at such a hearing. Any error in not holding such a hearing was harmless. *State v. Olive,* 47 Wn. App. 147, 151, 734 P.2d 36, *review denied,* 109 Wn.2d 1017 (1987). Wood's egregious lack of remorse supports the exceptional sentence.

■ Planning and sophistication are listed in RCW 9.94A.390 as subfactors to be considered when imposing exceptional sentences for major economic crimes or violations of the Uniform Controlled Substances Act. Because the statutory factors are illustrative and not exclusive, however, planning and sophistication have also been considered as aggravating sentencing factors in other crimes. *See, e.g., Dunaway,* 109 Wn. 2d at 218–19. Generally, a reason offered to justify an exceptional sentence can be considered only if it takes into account "factors other than those which are necessarily considered in computing the presumptive range for the offense." *State v. Nordby,* 106 Wn.2d at 518. The "planning" that the court considered here, discussions over a long period of time with different people concerning ways to kill, is qualitatively and quantitatively different from the basic premeditation required for first degree murder. *See State v. Brooks,* 97 Wn.2d 873, 876, 651 P.2d 217 (1982) ("'premeditate' encompasses the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short."). Wood's planning justifies an exceptional sentence in this case.

■ Sophistication justifies an exceptional sentence only if it is "of a kind not usually associated with the commission of the offense[s] in question." *Dunaway,* 109 Wn.2d at 219. The degree to which Wood maneuvered and manipulated to convince others to commit crimes on her behalf shows a level of sophistication beyond that necessary to the offense; it also supports the exceptional sentence.

■ Future dangerousness is recognized as an aggravating circumstance justifying an exceptional sentence. *State v. Edwards,* 53 Wn. App. 907, 914, 771 P.2d 755, *review denied,* 113 Wn.2d 1002 (1989). Generally, however, the factor is considered when the defendant has a long history of similar conduct and shows no amenability to treatment. *See State v. Shephard,* 53 Wn. App. 194, 200–02, 776 P.2d

467 (1988). Here, Wood had no history of this kind of manipulative conduct, and the record is silent on amenability to any kind of treatment.[5] The court merely concluded that, because of her ability to manipulate people, Wood represented a danger to society. As this court has previously held, however, an offender's personality or predicted dangerousness, standing alone, is not a proper basis for an exceptional sentence. *State v. Payne, supra.* In this case, future dangerousness has not been established, and this factor does not support an exceptional sentence. Nevertheless, the exceptional sentence is amply justified by Wood's planning, sophistication, and egregious lack of remorse. We uphold the sentence on these factors alone. *See State v. Fisher,* 108 Wn.2d 419, 429–30, 739 P.2d 683 (1987).

Affirmed.

ALEXANDER, C.J., and FARIS, J. Pro Tem., concur.

Review denied at 115 Wn.2d 1015 (1990).

---

[5]The presentence report notes that the defense had a psychological evaluation done but that the report was not presented to the investigating officer for the purpose of the report.