[No. 10348-0-III.   Division Three.   July 7, 1992.]

THE STATE OF WASHINGTON, *Respondent,* v. MARVIN LEE
VERMILLION, *Appellant.*

334

*Thomas Bothwell* and *Prediletto, Halpin, Scharnikow & Bothwell, P.S.,* for appellant.

*Jeffrey C. Sullivan, Prosecuting Attorney,* and *Steven Keller, Deputy,* for respondent.

SHIELDS, C.J. — Following a jury trial in which he represented himself, Marvin Lee Vermillion was convicted of one count of first degree possession of stolen property and two counts of second degree possession of stolen property (counts 5 through 7). Following a second jury trial in which he was represented by appointed counsel, he was convicted of one count of indecent liberties by forcible compulsion, one count of unlawful imprisonment, one count of first degree burglary and one count of attempted first degree burglary (counts 1 through 4). He was sentenced to exceptional sentences on counts 1 through 4 and within the standard range on counts 5 through 7, with all sentences to be served concurrently. The total sentence was 120 months. Mr. Vermillion appeals, contending the trial court erred by: denying him his right to appointed counsel in the first trial; refusing to sever count 4 from counts 1 through 3 in the second trial; incorrectly calculating his offender score; and imposing an exceptional sentence. He also challenges the sufficiency of the evidence on count 4, attempted first degree burglary.[1] We affirm the convictions, but remand for resentencing.

---

[1] Mr. Vermillion did not file a pro se brief although he was granted two extensions to do so. Pro se, he requested verbatim reports of jury voir dire, opening statements and "portions of the transcripts dealing with the jury verdict" from both trials be made part of the record on appeal; however, he did not inform this court, despite an extension of time to do so, what issues he intended to raise relative to these portions of the record.

The facts as related by the victims are not in dispute. Mr. Vermillion denies any involvement in the offenses, claiming mistaken identity.

### Counts 1 Through 3

On September 21, 1987, a man identifying himself as Joe Porter called Yakima realtor Ann Fraley, and stated he was at a phone booth in Ellensburg, Washington, would be in Yakima for 2 days in connection with a new job and was interested in looking for a house. They arranged to meet at the Thunderbird Motel, and he described himself to her. When Ms. Fraley drove up to the motel entrance, the man came out, shook her hand and got into her car. He told Ms. Fraley he was a physician practicing in Bellevue; had a wife, Nicole, and a 16-year-old son; had served as a physician in the military for 20 years, including three tours of duty in Vietnam; and planned to move to Yakima to do cancer research because he was dissatisfied with malpractice insurance rates.

Ms. Fraley showed the man three houses, none of which interested him. They went to see a fourth house, located in Terrace Heights near the country club. It was dark when they arrived. After some difficulty Ms. Fraley disconnected the alarm system and showed the man the entire house. From there they went to her office and then back to the Thunderbird's coffee shop, where they further discussed his housing needs. The man told Ms. Fraley a cancer patient of his had taken a turn for the worse so he was going to check in with the Yakima hospital and then go home. He arranged to call Ms. Fraley the next day at 9:30 a.m.

The man called the following day at exactly 9:30 a.m., told Ms. Fraley he wanted to see the Terrace Heights house in daylight and arranged to have her meet him at the country club. As Ms. Fraley drove up to the country club the man walked up to her car. He rode with her to the house, although it was only three blocks away and Ms. Fraley had suggested he drive there on his own.

At the house the man said he wanted to take some measurements. Ms. Fraley obtained a tape measure from her car, and he began to write down room measurements on a piece of paper. In a bedroom he said he needed to measure the height of a wall to assure the headboard on his son's bed would fit in the room. He held the tape measure to the ceiling as Ms. Fraley held it to the floor. While she was kneeling on the floor the man jumped on her, knocking her to the ground and causing her shoes and earrings to come off. The man's voice became angry, and he told her, "Don't make any noise. I won't penetrate you. I only want some kissing and petting." He proceeded to feel her breasts and underneath her skirt. Ms. Fraley pleaded with him to stop. He then tied her wrists with shoelaces he had brought with him, took her to a utility room where he tied her ankles and told her to remain for 15 minutes. Ms. Fraley waited, freed herself, and contacted her office. Police responded, and a detective verified a Dr. Joe Porter had been registered at the Thunderbird but was not the man who attacked Ms. Fraley.

### Counts 5 Through 7

On September 7, 1988, Salt Lake City, Utah, realtor Anushka Coverdale filed a report with the police stating her purse and all its contents, including credit cards and checkbook, were missing after showing houses to a man who had identified himself as William Porter.

On October 11, 1988, Steven Zitting, a car salesman at Ken Garff Enterprises in Salt Lake City, reported a Dodge Colt stolen. He stated a man identifying himself as Bingham Coverdale had visited his lot on October 7 looking for a car for his college-bound son. The man returned the next day; completed a credit application and a buyer's agreement; verified insurance information, including a policy number; purchased the Dodge Colt, writing a personal check on Mr. Coverdale's account for $4,600; had Mr. Zitting bring the car to a nearby Phillips 66 station, where the man had arranged

to have a stereo installed; drove Mr. Zitting back to the car lot; and arranged to return to the car lot 3 days later to complete licensing paperwork. The man never returned to either the gas station or the car lot. Mr. Zitting called Ms. and Mr. Coverdale and learned they had not bought the car.

## Count 4

On October 23, 1988, Yakima realtor Becky Downey conducted an open house advertised in the local newspaper. A man identifying himself as Larry Bently entered the house shortly after 1 p.m. and stayed about 2 hours, looking over the house and studying Ms. Downey's multiple listing book. He told Ms. Downey he had recently been discharged from the military, having served three tours of duty in Vietnam; was in town for about 1 day to buy a house, paying cash; and was interested in seeing $70,000 to $90,000 houses. The man left the open house at 3 p.m. and arranged for Ms. Downey to pick him up at the Towne Plaza Motel and show him houses he had selected from her multiple listing book.

Ms. Downey showed the man several houses in Selah, Yakima and Naches. He had Ms. Downey take him to see two vacant houses, the last one recently built by United Builders, before dropping him off at the Towne Plaza. He arranged to have her pick him up the next morning at 9:30 at the Towne Plaza, although he was not staying the night at that motel. He told Ms. Downey he wanted to see the vacant United Builders house again, even though when they initially looked at it Ms. Downey had told him it probably was no longer available because a notice in the house stated a prospective buyer's offer had been accepted and the sale was pending completion of financing.

That evening Ms. Downey called a female colleague and reported on the open house as well as her prospective cash buyer. After hearing the description of the man, the colleague suggested Ms. Downey contact Ms. Fraley. The two women talked, compared the man involved in both events and contacted the police.

The next day, October 23, Ms. Fraley was in a car outside the Towne Plaza with detectives at 9:30 a.m. when she saw

the man, now known as Mr. Bently, walk out the front entrance and look around. She identified him as the man who had attacked her in 1987. Ms. Downey arrived a few minutes later, accompanied by a male realtor, whom she introduced to the prospective buyer as a professional colleague along to evaluate her performance as a realtor. The man was upset because Ms. Downey was late and was not alone. Detectives approached the man, Ms. Downey and her male colleague as they came out of the Towne Plaza. The man stated his name was Larry Bently, but he had no identification.

At the police station a detective found two paisley ties hidden behind a picture when he returned to the interview room after leaving the man, by then identified as Mr. Vermillion, alone for a few minutes. At booking, a key ring with keys was taken from him and placed in his property box. Mr. Vermillion was charged with counts 1 through 4.

Three days later, Mr. Vermillion called and asked his 16-year-old son, Marvin Bear, to come to the jail. During the visit, Mr. Vermillion asked him to pick up the Dodge Colt, drive it to the Seattle area and put it in storage. Mr. Bear and his mother, Nicole Wright, found the car contained a purse and a sales agreement made out to Bingham Coverdale. At that point, they locked the car and left it.

Ms. Wright gave the keys her son had received to a detective and told him where to find the car. In it the detective found a purse containing credit cards in Ms. Coverdale's name; other credit cards and check registers in Mr. Coverdale's name; items bearing Mr. Vermillion's name; and Mr. Vermillion's fingerprints. Mr. Vermillion was then charged with counts 5 through 7, which were severed and tried first.

# I
## RIGHT TO COUNSEL; FIRST TRIAL

Mr. Vermillion contends: (1) he did not unequivocally waive his right to counsel, but chose to represent himself due to inadequate public defenders; and (2) he was entitled to standby counsel.

■ ■ The determination a defendant has intelligently waived counsel is within the discretion of the trial court and depends on the particular facts and circumstances. *State v. Smith*, 50 Wn. App. 524, 528, 749 P.2d 202, *review denied*, 110 Wn.2d 1025 (1988). The trial court has the duty to review the disadvantages of proceeding without counsel with a defendant and ensure the record reflects this effort. *State v. Christensen*, 40 Wn. App. 290, 698 P.2d 1069, *review denied*, 104 Wn.2d 1003 (1985). The record establishes the trial court fulfilled this duty.

At two separate hearings the trial court thoroughly questioned Mr. Vermillion and his appointed counsel about Mr. Vermillion's representation by counsel and self-representation, as well as his education and intellectual capacity. The trial court advised him of the dangers and disadvantages of a decision to proceed without counsel. Mr. Vermillion unequivocally demanded to represent himself and made a knowing and intelligent waiver of his right to counsel. Granting Mr. Vermillion his right to self-representation was a proper exercise of the trial court's discretion.

· ■ Mr. Vermillion's argument he was also entitled to standby counsel to assist him is without merit. The right to proceed pro se and the right to assistance of counsel are mutually exclusive. *See State v. Hegge*, 53 Wn. App. 345, 766 P.2d 1127 (1989). Mr. Vermillion was entitled to represent himself or be represented by appointed counsel. His objections to the counsel originally appointed for him were not reasons which would have allowed him the right to replacement counsel. *See State v. Staten*, 60 Wn. App. 163, 802 P.2d 1384, *review denied*, 117 Wn.2d 1011 (1991); *State v. Sinclair*, 46 Wn. App. 433, 436-37, 730 P.2d 742 (1986), *review denied*, 108 Wn.2d 1006 (1987); *Adams v. Carroll*, 875 F.2d 1441 (9th Cir. 1989).

## II
### JOINDER OF COUNT 4 WITH COUNTS 1 THROUGH 3; EVIDENCE OF OTHER WRONG

Mr. Vermillion contends the joinder at trial of count 4 with counts 1 through 3 was prejudicial and unfair because

the alleged offenses occurred more than 1 year apart and involved two different victims.[2]

■ A motion to sever offenses focuses on potential prejudice to the defendant. *State v. Gatalski*, 40 Wn. App. 601, 606, 699 P.2d 804, *review denied*, 104 Wn.2d 1019 (1985). To determine whether the inherently prejudicial effect of joinder requires severance, this court considers all of the following factors, none of which is preeminent: (1) the strength of the State's evidence on each count; (2) the clarity of the defenses as to each count; (3) the existence of an instruction to consider each count separately; and (4) the admissibility of evidence of the other crimes. *State v. Watkins*, 53 Wn. App. 264, 766 P.2d 484 (1989).

Applying the first three *Watkins* factors, the record establishes: the State's evidence was strong on all counts; Mr. Vermillion's defense of mistaken identity was clear; and the jury was adequately instructed to consider each count separately by instruction 5. Applying the fourth *Watkins* factor requires an analysis of ER 404(b).

■ Whether evidence is admissible under ER 404(b)[3] requires the court to determine: (1) whether the evidence is relevant to prove any of the issues permitted by ER 404(b); (2) whether any prejudicial effect is outweighed by the probative value; and (3) whether limitation of the purpose for which the jury may consider the evidence can be accomplished. *Watkins*, at 270.

The trial court properly analyzed the evidence of counts 1 through 3 and count 4, determined it was relevant to show no mistake of identity and any prejudicial effect was outweighed by its probative value, and adequately instructed the jury on the limited use it could make of that evidence.

---

[2]Counts 1 through 3 involved Ms. Fraley on September 22, 1987; count 4 involved Ms. Downey on October 23 and 24, 1988.

[3]ER 404(b) reads:
"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

■ Mr. Vermillion has not established the joint trial was so manifestly prejudicial it outweighed the concern for judicial economy. *See State v. Bythrow*, 114 Wn.2d 713, 790 P.2d 154 (1990). The trial court's refusal to sever count 4 from counts 1 through 3 was a proper exercise of its discretion.

### III
#### SUFFICIENCY OF THE EVIDENCE OF ATTEMPTED
#### FIRST DEGREE BURGLARY

Mr. Vermillion contends the evidence was insufficient to establish count 4, attempted first degree burglary, because the State failed to show he either entered or remained unlawfully on the property Ms. Downey was showing him and failed to show preparation or intent to commit an assault against Ms. Downey.

■ ■ Evidence is sufficient to support a criminal conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 220-21, 616 P.2d 628 (1980). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Porter*, 58 Wn. App. 57, 60, 791 P.2d 905 (1990) (quoting *State v. Spruell*, 57 Wn. App. 383, 385, 788 P.2d 21 (1990)). Circumstantial evidence is as probative as direct evidence. *State v. Kroll*, 87 Wn.2d 829, 842, 558 P.2d 173 (1976).

The crime of attempt requires proof of two elements: (1) intent to commit a specific crime; and (2) a substantial step toward the commission of that crime. *State v. Smith*, 115 Wn.2d 775, 782, 801 P.2d 975 (1990); RCW 9A.28.020(1). Mr. Vermillion's intent toward Ms. Downey was established by his virtually identical prior conduct toward Ms. Fraley. Mr. Vermillion's preparation was established by enticing Ms. Downey to show him houses in which to commit the crime, reconnoitering the houses in advance, selecting one for the commission of the crime the next day, and possession of two neckties which could be used in the commission of the crime.

The evidence was sufficient for the jury to find both elements of attempted first degree burglary beyond a reasonable doubt.

## IV
### CALCULATION OF OFFENDER SCORE

Mr. Vermillion contends the trial court incorrectly calculated his offender score under the same criminal conduct policy of the Sentencing Reform Act of 1981 (SRA).

RCW 9.94A.400(1)(a) provides:

> [W]henever a person is to be sentenced for two or more current offenses, the sentence range for each current offense shall be determined by using all other current and prior convictions as if they were prior convictions for the purpose of the offender score: PROVIDED, That if the court enters a finding that some or all of the current offenses encompass the same criminal conduct then those current offenses shall be counted as one crime.

The Legislature amended the statute in 1987 and added the following:

> "Same criminal conduct," as used in this subsection, means two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim.

*See* Laws of 1987, ch. 456, § 5, p. 1980.

In deciding if crimes encompass the same criminal conduct, the focus is on the extent to which the criminal intent, as objectively viewed, changed from one crime to another. *State v. Dunaway*, 109 Wn.2d 207, 215, 743 P.2d 1237, 749 P.2d 160 (1987). *Dunaway* analyzes three related issues: whether (1) one crime furthered the other; (2) the time and place of the crimes remained the same; and (3) the same victim was involved in both. If all three issues are not resolved affirmatively, the crimes do not encompass the same criminal conduct and must be counted separately. Thus, if different crimes involved different victims, a court must treat the crimes as separate in calculating the offender score. *State v. Dunbar*, 59 Wn. App. 447, 798 P.2d 306 (1990), *abrogated on other grounds in State v. Lessley*, 118 Wn.2d 773, 827 P.2d 996 (1992).

Mr. Vermillion's contention counts 5, 6 and 7 should have been treated as one offense because his possession of the three categories of stolen property involved the "same criminal conduct" is without merit. Counts 5, 6 and 7 involved three different victims;[4] the trial court was required to treat them as separate offenses.

Mr. Vermillion's contention counts 1, 2 and 3 should have been treated as one offense presents a somewhat different problem. They all arguably involved the same victim[5] and they occurred at the same time and place. The question as to these counts is whether the objective criminal intent changed from one to another.

For purposes of conviction of count 3, first degree burglary, it was necessary for the jury to find Mr. Vermillion intended to commit the assault of count 1, indecent liberties. To that extent, count 1 furthered the commission of count 3.[6] Count 2, however, did not further the commission of count 3, nor did count 2, unlawful imprisonment, further the commission of count 1. The crime of indecent liberties was by then committed. This is clearly reflected in the judgment and sentence, although the record of the sentencing proceeding reflects either a misstatement of the count or a typographical error that counts 1 and 2 constituted the same criminal conduct.

---

[4]Mr. Vermillion also argues the credit cards in counts 6 and 7 involved only one victim, a married couple. However, 11 different credit cards were involved; none represented one account in two names. Each spouse was a victim as that term is defined in RCW 9.94A.030(32).

[5]See State v. Collicott, 112 Wn.2d 399, 418, 771 P.2d 1137 (1989) (Collicott I) (Durham, J., dissenting).

[6]We note that since trial and argument on appeal State v. Collicott, 112 Wn.2d 399, 771 P.2d 1137 (1989) has been rejected by State v. Collicott, 118 Wn.2d 649, 827 P.2d 263 (1992) (Collicott II). The merger rule of State v. Johnson, 92 Wn.2d 671, 600 P.2d 1249 (1979), cert. dismissed, 446 U.S. 948 (1980), was also considered in connection with the burglary antimerger statute, RCW 9A.52.050. Collicott II, at 658, found no conflict between the burglary antimerger statute and RCW 9.94A.400(1)(a). See also Lessley, at 781.

Mr. Vermillion's sentence, which reflects count 1 and count 3 were treated as one offense and count 2 as a separate offense, was not error.

## V
### JUSTIFICATION OF EXCEPTIONAL SENTENCE

Mr. Vermillion contends the reasons given by the court for his exceptional sentence are not supported by the record, and do not justify imposing an exceptional sentence. He also contends the sentence is clearly excessive.

A sentencing court may impose a sentence outside the standard range if it finds there are "substantial and compelling reasons justifying an exceptional sentence." RCW 9.94A-.120(2).

In reviewing an exceptional sentence under RCW 9.94A.210(4)(a), this court must first determine whether the trial court's reasons are supported by the record, a factual question which will be upheld unless clearly erroneous. Second, this court must independently determine as a question of law whether the sentencing court's reasons justify an exceptional sentence. The reasons given must take into account factors other than those necessarily considered in computing the presumptive range for the offense. *State v. McAlpin*, 108 Wn.2d 458, 462-63, 740 P.2d 824 (1987); *State v. Nordby*, 106 Wn.2d 514, 518, 723 P.2d 1117 (1986). Last, this court must examine whether the sentence imposed was "clearly excessive". *McAlpin*, at 467.

The statute lists factors which may be considered by the sentencing court to justify imposition of an exceptional sentence; however, these factors are illustrative only and not exclusive. RCW 9.94A.390; *McAlpin*, at 463; *Nordby*, at 516.

The court's reasons for imposing an exceptional sentence were:

### FINDINGS OF FACT

A. In each of these crimes, the defendant actively sought out his victims. With each real estate agent, he assumed a false identity and gained their trust and confidence by posing as a legitimate buyer. In each incident he gave an extensive personal history supporting his assumed identity. The defendant

cased out the location of the homes by viewing them more than once before the assault.

At the time of the attempted First Degree Burglary, the defendant did not carry any identification with him.

B. In reference to the First Degree Possession of Stolen Property charge, the defendant obtained the car by inventing an identity based on the identification and records belonging to the owners of the purse and credit cards.

C. In these cases, the defendant misled his victims as to where he was staying during the time of the crime making it more difficult to apprehend him.

D. The defendant was convincing enough in his assumed identities to persuade the victims to place their trust in him and accept him for what he claimed to be.

E. The defendant assaulted the first victim in this case in September of 1987 and attempted another assault in October of 1988.

The court's justifications for imposing an exceptional sentence were:

### CONCLUSIONS OF LAW

A. The crimes the defendant was convicted of involved a high degree of sophistication and planning and occurred over a lengthy period of time.

B. The defendant used a position of trust and confidence to facilitate the commission of these offenses.

C. The defendant has consistently refused to even admit his responsibility for these crimes and shows no remorse for his crimes making it unlikely that therapy or treatment would be beneficial.

D. The defendant committed each of these crimes in a predatory fashion by actively seeking out his victims.

E. The real estate agents became vulnerable victims when the defendant persuaded them to take him to vacant homes.

In summary, the trial court justified its exceptional sentence because: (1) the defendant utilized a high degree of sophistication and planning to commit the crimes; (2) the defendant abused a position of trust (developed in a predatory fashion) to facilitate the crimes; (3) the defendant showed no remorse for his conduct; and (4) the defendant knew the victims were particularly vulnerable.

■ 1. High degree of sophistication and planning. Courts have used the subfactors of sophistication and planning listed in the major economic and major drug factors of RCW 9.94A.390 to justify exceptional sentences in cases which do

not involve economic or drug offenses. The sophistication must be " 'of a kind not usually associated with the commission of the offense[s] in question.' " *State v. Wood*, 57 Wn. App. 792, 801, 790 P.2d 220 (quoting *State v. Dunaway*, 109 Wn.2d 207, 219, 743 P.2d 1237, 749 P.2d 160 (1987)), *review denied*, 115 Wn.2d 1015 (1990).

The evidence at trial established Mr. Vermillion sought out his victims, assumed a false identity and personal history, reviewed possible locations and selected a suitably remote location for the commission of his offense, carried no identification, concealed his place of lodging, used a car which could not be traced to him even if he had been seen in it, conducted himself appropriately until the moment of commission and possessed items to be used to tie up his victims. The reasons listed by the trial court in findings A, C and D are supported by the record.

The crimes of indecent liberties by forcible compulsion, unlawful imprisonment and first degree burglary are not usually associated with the qualitative and quantitative planning the trial court considered, nor the maneuvering and manipulation to gain the trust and confidence of the target victims. *Wood*, at 801. The trial court's reasons justify an exceptional sentence based upon planning and sophistication.

2. Abuse of position of trust. Use of a position of trust, confidence, or fiduciary responsibility to facilitate the crime is an aggravating factor. RCW 9.94A.390(2)(c)(iv). The factor is listed under both the major drug and major economic factors; however, it has been used by courts in other areas to justify an exceptional sentence. *See State v. Grewe*, 117 Wn.2d 211, 813 P.2d 1238 (1991); *State v. Creekmore*, 55 Wn. App. 852, 862-63, 783 P.2d 1068 (1989), *review denied*, 114 Wn.2d 1020 (1990); *State v. Harp*, 43 Wn. App. 340, 343, 717 P.2d 282 (1986).

When analyzing abuse of trust, the focus is on the defendant: Was the defendant (1) in a position of trust and (2) was the position used to facilitate the commission of the offense? Whether the defendant is in a position of trust

depends on the length of the relationship with the victim,[7] the trust relationship between the primary care giver and the perpetrator of a sexual offense against a child,[8] the vulnerability of the victim to trust because of age,[9] and the degree of the defendant's culpability.[10] Although evidence at trial established Mr. Vermillion persuaded the victims to place their trust in him by misleading them as to his identity and personal history, the persuasion inheres in his sophistication and planning. Here, Mr. Vermillion created a condition of trust and confidence, but cannot be said to have been in a position of trust: the length of his relationship with the victims was brief, even fleeting; he was not a care giver; the victims were not particularly vulnerable to trust; and there was no degree of culpability greater than that involved in the commission of the crime itself. The trial court's reasons, although supported by the record, do not justify an exceptional sentence based on abuse of trust.

■ 3. Lack of remorse. Lack of remorse has been recognized as an aggravating circumstance. *Creekmore*, at 860; *State v. Ratliff*, 46 Wn. App. 466, 470, 731 P.2d 1114 (1987). Conclusion C states Mr. Vermillion shows lack of remorse making it unlikely that therapy or treatment would be beneficial. Except in sexual offender cases, amenability to treatment with a requirement that it be undertaken is outside the purview of the SRA. Furthermore, the record does not support a finding of lack of remorse. There is no factual foundation for conclusion C. Sentencing courts may not use a defendant's professed innocence alone as a basis for justifying an exceptional sentence. *State v. Delarosa-Flores*,

---

[7]*State v. Fisher*, 108 Wn.2d 419, 739 P.2d 683 (1987).

[8]*State v. Brown*, 55 Wn. App. 738, 780 P.2d 880 (1989), *review denied*, 114 Wn.2d 1014 (1990).

[9]*State v. Grewe, supra* at 216-17.

[10]*State v. Creekmore, supra* at 863.

59 Wn. App. 514, 519, 799 P.2d 736 (1990), *review denied*, 116 Wn.2d 1010 (1991).

■ 4. Particularly vulnerable victim. The particular vulnerability of a victim may be an aggravating factor. RCW 9.94A.390(2)(b). When analyzing particular vulnerability, the focus is on the victim: Was the victim more vulnerable to the offense than other victims and did the defendant know of that vulnerability? *See State v. Jones*, 59 Wn. App. 744, 801 P.2d 263 (1990), *review denied*, 116 Wn.2d 1021 (1991); *State v. Stevens*, 58 Wn. App. 478, 794 P.2d 38, *review denied*, 115 Wn.2d 1025 (1990); *State v. Jackmon*, 55 Wn. App. 562, 566-67, 778 P.2d 1079 (1989).

The victims of counts 1 through 3 and 4 were female real estate agents, working alone showing clients vacant houses, and Mr. Vermillion was aware of that fact. However, the court made no finding either of them was particularly vulnerable, thus distinguishing them from any other victims of indecent liberties. There is no factual foundation for conclusion E. Conclusion E lacks the requisite factor of *particular vulnerability*.

■ The exceptional sentence here is justified only by sophistication and planning. "Where the sentencing judge has given both proper and improper grounds for imposing an exceptional sentence, this court may affirm rather than remand when we are satisfied that the judge would have imposed the same sentence absent the improper factor." *State v. Drummer*, 54 Wn. App. 751, 760, 775 P.2d 981 (1989). We cannot say imposition of the exceptional sentence here, based only on the sophistication and planning of the crimes, would have been the same.

We affirm the convictions, set aside the sentence and remand for resentencing.

We need not examine whether the sentence was clearly excessive, other than to observe that on resentencing the decision regarding length of an exceptional sentence should be exercised on tenable grounds or for tenable reasons.

*State v. Oxborrow,* 106 Wn.2d 525, 531, 723 P.2d 1123 (1986) (quoting *State v. Strong,* 23 Wn. App. 789, 794, 599 P.2d 20 (1979)).

MUNSON and THOMPSON, JJ., concur.

Review denied at 120 Wn.2d 1030 (1993).