IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  48705-5-II |
| Respondent, | |
| v. | |
| DAVID ANGLE RAMIREZ, | UNPUBLISHED OPINION |
| Appellant. | |

SUTTON, J. — David A. Ramirez appeals his conviction for assault in the third degree with sexual motivation and the jury's special verdict that he displayed an egregious lack of remorse. We hold that (1) defense counsel was not deficient in failing to request an involuntary intoxication instruction, (2) sufficient evidence supported the jury's special verdict that Ramirez displayed an egregious lack of remorse, (3) the trial court did not err in imposing discretionary legal financial obligations (LFOs), and (4) Ramirez's statement of additional grounds (SAG) claims have no merit.  Thus, we affirm.

FACTS

I. BACKGROUND

Ramirez went to a bar in Centralia on the night of September 18, 2015, and had a few drinks.  He met some people at the bar who invited him back to their house after the bar closed. After drinking a beer that he was offered at their house, Ramirez began hallucinating.  He saw snakes and was afraid of the cats in the home because he did not know what they were.  Ramirez

had never hallucinated before and thought he was going to die. A woman at the house drove him to the hospital.

On arrival at the hospital, Ramirez told a receptionist that he was not feeling right, was seeing things, and had done too many drugs. The receptionist notified the nurses' station that Ramirez was hallucinating. Wendy Wilkinson, an emergency room (ER) nurse, responded to assist Ramirez, and walked him back to an examination room. Once inside the examination room, Wilkinson turned toward Ramirez to hand him a hospital gown and he reached out and grabbed her breast. After a few seconds, he let go and backed away to the other side of the room. An ER technician walked into the room just as Ramirez was releasing his hand from Wilkinson's breast. Wilkinson immediately left the room and contacted security.

Immediately after the incident, Ramirez was very agitated, moved around a great deal, and mumbled "a bunch of stuff." I Verbatim Report of Proceedings (VRP) at 147. Ramirez shouted profanities as a security officer entered the room; when the security officer identified himself, Ramirez shouted that he was not gay. Ramirez was moved to an examination room reserved for psychiatric patients and security officers observed him.

While in the second examination room, Ramirez made comments as women walked by his room: "Look at her butt. They are glad I groped her. They should be thankful. They should be thanking me." I VRP at 163. During this period, his hands were under the blanket that covered him and he appeared to be masturbating. The ER technician arrived as Ramirez appeared to be masturbating. As the technician was drawing Ramirez's blood, Ramirez commented "numerous times" that the way the nurses were dressed indicated that they wanted to have sex with him. I VRP at 148. Ramirez also stated, "over and over" that there was something going on—

2

"something about a program"—that people weren't going to be happy with what they were doing. I VRP at 147, 150. Ramirez was "antsy" and "sweating profusely." I VRP at 152. When a doctor arrived and asked Ramirez why he was in the ER, Ramirez stated that he wanted to have sex with a female nurse, and that he was tired of masturbating. He declined treatment for the hallucinations, or for blood or lab work.

Two police officers arrived and when one asked Ramirez what was going on, Ramirez stated, "Nothing, dog." II VRP at 287. When asked why he grabbed the nurse's breast, Ramirez replied, "If that's what she want (*sic*) to say." II VRP at 287. When asked why he had been masturbating, Ramirez stated, "Whatever, dog. Was I masturbating?" II VRP at 288. Ramirez was arrested for assaulting Wilkinson.

As the officers prepared to dress Ramirez for transport, they searched his clothing for weapons and contraband. The officers found a glass pipe and two packets containing meth-amphetamine. In response to the officers' discovery of the drugs, Ramirez stated that they had been given to him and he was going to have them tested. Ramirez was charged with assault in the third degree with sexual motivation and possession of a controlled substance—methamphetamine. The State sought an exceptional sentence based on four aggravating circumstances, including that Ramirez demonstrated or displayed an egregious lack of remorse for the assault.

## II. PROCEDURE

### A. TRIAL

Ramirez, the ER receptionist, the ER technician, Wilkinson, the doctor, the security officer and the police officers testified to the above facts. Ramirez also testified that he was scared during the hallucinations and went to the ER for help. When asked during direct examination whether he

took any drugs the day of the incident, Ramirez stated, "No, not willingly. I don't know what was given to me." II VRP at 273. Ramirez testified that he believed the people at the house gave him something without his knowledge. He also testified that he had used methamphetamine in the past, but had never hallucinated. When asked whether he was in possession of methamphetamine or a pipe during the incident, Ramirez stated, "Not that I knew of" and "Not that I was aware of." II VRP at 277. Ramirez also testified that he did not remember seeing any of the witnesses that testified at trial, except for one of the police officers. He stated that he was "in a delusional state." II VRP at 279. Ramirez also testified that he remembered that when he left the house to go to the ER it was daylight and children were getting on school buses.

As to Ramirez's demeanor, the ER receptionist testified that "[h]e was a little slow" in carrying on a conversation. I VRP at 127. The security officer testified that Ramirez was "coherent" and "knew where he was." I VRP at 165. One of the police officers thought Ramirez "[s]eemed rather fidgety, a little agitated," but that "[h]e was controlling himself." I VRP at 182, 184. The security officer also testified that they maintained a security presence after the police officers arrived "to relieve the anxiety of staff, because staff were really uncomfortable with [] Ramirez." I VRP at 164.

No. 48705-5-II

B. JURY INSTRUCTIONS

The trial court instructed the jury on assault, unwitting possession of a controlled substance

as proposed by defense counsel, and voluntary intoxication, as agreed to by defense counsel.[1]

---

[1] The assault instructions stated,

> A person commits the crime of assault in the third degree when he assaults a nurse who was performing her nursing duties at the time of the assault.

CP at 46 (Jury Instr. No. 5).

> An assault is an intentional touching of another person, that is harmful or offensive regardless of whether any physical injury is done to the person. A touching is offensive if the touching would offend an ordinary person who is not unduly sensitive.

CP at 48 (Jury Instr. No. 7).

> A person acts with intent or intentionally when acting with the objective or purpose to accomplish a result that constitutes a crime.

CP at 49 (Jury Instr. No. 8).

The unwitting possession instruction stated,

> A person is not guilty of possession of a controlled substance if the possession is unwitting. Possession of a controlled substance is unwitting if a person did not know that the substance was in his possession or did not know the nature of the substance.
>
> The burden is on the defendant to prove by a preponderance of the evidence that the substance was possessed unwittingly. Preponderance of the evidence means that you must be persuaded, considering all of the evidence in the case, that it is more probably true than not true.

CP at 56 (Jury Instr. No. 15).

5

Defense counsel did not originally propose a voluntary intoxication instruction, but the State did propose one assuming that the defense would propose the instruction. Ultimately, defense counsel agreed to the instruction proposed by the State. Defense counsel never proposed an involuntary intoxication instruction.

## C.  CLOSING ARGUMENT

During closing argument, defense counsel argued that "the condition [Ramirez] was in on that day: Disheveled, really kind of not knowing what is going on or where he is, [was] somebody who was under the influence of narcotics." II VRP at 321. Defense counsel also argued that Ramirez's difficulty in answering the prosecutor's questions about details on the day in question was "evidence of a person who can't remember what was happening." II VRP at 323. Defense counsel emphasized that Ramirez was having hallucinations and that the witnesses testified that his demeanor reflected someone who was under the influence. Defense counsel commented on Ramirez's state of mind:

> My client was not in a state of mind where he could have formed that intent due to the fact that he was under the influence of these drugs.
>
> My client says he doesn't know where the drugs came from. There was a mention in testimony that my client brought those with him. Somebody had given them to him, I believe, but he did mention that he brought them to have them tested to see what they were. He didn't know what they were, didn't know if that's what was causing him to have hallucinations.

The voluntary intoxication instructed stated,

> No act committed by a person while in a state of voluntary intoxication is less criminal by reason of that condition. However, evidence of intoxication may be considered in determining whether the defendant acted with intent.

CP at 55 (Jury Inst. No. 14).

II VRP at 329-30.

D. VERDICT

The jury found Ramirez guilty of both charges, assault in the third degree and possession of a controlled substance. The jury also found by special verdict that he committed the assault with sexual motivation and that he had displayed an egregious lack of remorse.

E. SENTENCING

At sentencing, Ramirez advised the court that, prior to his arrest, he had a temporary job working for a nursery, was paying all of the household bills, had opened a bank account for the first time in his life, and "was just getting on track." II VRP at 360. Ramirez also told the court that although he was working a minimum wage job it "was fine because it took care of everything." II VRP at 363. The court imposed discretionary LFOs of $2,100 in attorney fees and $200 in court costs. Ramirez did not object. Ramirez appeals.

ANALYSIS

I. INEFFECTIVE ASSISTANCE OF COUNSEL

Ramirez argues that defense counsel's failure to propose an involuntary intoxication instruction was deficient and prejudiced him. He argues prejudice, because trial counsel failed to provide the jury with the instruction it needed to acquit Ramirez if they believed that he did not voluntarily take drugs. Ramirez argues that defense counsel advocated for the voluntary intoxication instruction proposed by the State and given by the court, which was inconsistent with his defense theory of the case. He argues that if the jury believed his testimony, that he did not voluntarily ingest the drugs, the jury had no instruction on involuntary intoxication from which to

acquit him on the assault charge.[2]  The State argues that defense counsel's failure to propose the instruction on involuntary intoxication was a reasonable strategic decision.  The State claims it was reasonable because defense counsel focused on the more credible defense that, due to Ramirez's intoxication, he was unable to form the requisite intent to assault the nurse, regardless of whether his intoxication was voluntary or involuntary.  We agree with the State.

We begin with a strong presumption that counsel's representation was reasonable.  *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011).  To prevail on an ineffective assistance claim regarding defense counsel's failure to request a jury instruction, the defendant must show that he was entitled to the instruction, counsel's performance was deficient in failing to request it, and the failure to request the instruction caused prejudice.  *Grier*, 171 Wn.2d at 32-33 (applying *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed 3d 674 (1984)).  Performance is deficient if, considering all the circumstances, the performance falls "'below an objective standard of reasonableness.'"  *Grier*, 171 Wn.2d at 33 (quoting *Strickland*, 466 U.S. at 687-88).

Legitimate trial tactics and strategies do not constitute deficient performance.  *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009).  Jury instructions are sufficient if they correctly state the law, are not misleading, and allow the parties to argue their respective theories of the case.  *State v. Stacy*, 181 Wn. App. 553, 569, 326 P.3d 136 (2014).

---

[2] Ramirez also argues that the voluntary intoxication instruction was improper because that instruction should not be given where involuntary intoxication is claimed by the defendant, but he does not assign error on that basis.  Thus, under RAP 10.3(a)(4), we do not consider this argument.

Here, the court correctly instructed the jury that in order to find Ramirez guilty of assault in the third degree, they needed to find beyond a reasonable doubt that he assaulted Wilkinson. The court's instructions defined assault as "an intentional touching of another person." CP at 48. Thus, if the jury found that Ramirez lacked the requisite intent due to his voluntary intoxication, he would be found not guilty. Further, juries are presumed to follow the court's instructions. *State v. Emery*, 174 Wn.2d 741, 766, 278 P.3d 653 (2012).

Here, defense counsel's strategy was to focus on the more credible defense of voluntary intoxication, that Ramirez's intoxication prevented him from forming an intent to assault Wilkinson. This strategy was reasonable. Defense counsel could have reasoned that presenting both defenses would have had potential to confuse the jury. Further, the evidence presented to the jury, was that Ramirez had previously used drugs, and that he had possessed drugs and drug paraphernalia at the hospital. It is possible that a jury would be unwilling to believe that Ramirez was slipped drugs. Also, it was perfectly reasonable for defense counsel to pursue the "voluntary intoxication" instruction to negate the intent element of assault as it would have had the same effect as the "involuntary" instruction if the jury believed Ramirez. Therefore, because defense counsel's strategy was reasonable, the failure to propose the involuntary intoxication instruction was not deficient. Therefore, this argument fails and we affirm the conviction of assault.

## II. SUFFICIENCY OF THE EVIDENCE

Ramirez next argues that there is insufficient evidence to support the jury's special verdict that he displayed an egregious lack of remorse as to the assault charge. The State argues that Ramirez's words and conduct at the ER showed an egregious lack of remorse and extreme indifference to the harm resulting from his assault of Wilkinson. We agree with the State.

9

The facts supporting an aggravating factor must be proved to a jury beyond a reasonable doubt. RCW 9.94A.537(3); *State v. Zigan*, 166 Wn. App. 597, 601, 270 P.3d 625 (2012). We review a challenge to a jury's special verdict of an aggravating factor under the same standard as we review a claim of insufficient evidence to support the elements of the crime. *State v. Stubbs*, 170 Wn.2d 117, 123, 240 P.3d 143 (2010). A defendant challenging the sufficiency of the evidence presented at trial admits the truth of the State's evidence and all reasonable inferences from the evidence in favor of the State. *State v. Houston-Sconiers*, 188 Wn.2d 1, 15, 391 P.3d, 417 (2017). We must determine whether, when reviewing the evidence in a light most favorable to the State, any rational jury could have found the presence of the aggravating circumstances beyond a reasonable doubt. *State v. Yates*, 161 Wn.2d 714, 752, 168 P.3d 359 (2007). Circumstantial and direct evidence are considered equally reliable. *Yates*, 161 Wn.2d at 752. We defer to the fact finder on issues of conflicting testimony, witness credibility, and the persuasiveness of the evidence. *State v. B.J.S.*, 140 Wn. App. 91, 97, 169 P.3d 34 (2007).

Division Three of this court has held that a defendant's lack of remorse was sufficiently egregious where he bragged and laughed about the murder he committed, thought the killing was funny, joked about being on television for the murder, and told police he felt no remorse. *State v. Erickson*, 108 Wn. App. 732, 739–40, 33 P.3d 85 (2001). We have held a defendant's lack of remorse to be sufficiently egregious when after a defendant's boyfriend shot her husband, the defendant joked with her boyfriend about the sounds her husband made after he had been shot; and when she met another boyfriend's family ten days after her husband's death. *State v. Wood*, 57 Wn. App. 792, 795, 790 P.2d 220 (1990).

Here, the trial court instructed the jury that

10

> [a]n egregious lack of remorse means that the defendant's words or conduct demonstrated extreme indifference to harm resulting from the crime. In determining whether the defendant displayed an egregious lack of remorse, you may consider whether the defendant's words or conduct (a) increased the suffering of others beyond that caused by the crime itself; (b) were of a belittling nature with respect to the harm suffered by the victim; or (c) reflected an ongoing indifference to such harm.
>
> A defendant does not demonstrate an egregious lack of remorse by denying guilt, remaining silent, asserting a defense to the charged crime, or failing to accept responsibility for the crime.

CP at 62 (Jury Instr. No. 20).

Witnesses testified that Ramirez checked into the ER claiming he was hallucinating. After Wilkinson escorted Ramirez to an examination room and attempted to hand him a gown, he grabbed her breast and let go after a few seconds, and Wilkinson called security. Ramirez was moved to another room and monitored by security guards. While being seen by the ER technician, the technician testified that Ramirez made comments that, based on how the nurses were dressed, they wanted to have sex with him. The security officer testified that Ramirez made "rude comments" about women as they passed by his room: "Look at her butt. They are glad I groped her. They should be thankful. They should be thanking me." I VRP at 163. During this time, security observed that, for an extended period of time, Ramirez was making movements under the hospital blanket consistent with masturbation. The security officer also testified that hospital staff were anxious because of Ramirez's conduct. Finally, the ER doctor who examined Ramirez testified that when he asked Ramirez why he was in the ER, he said that he wanted to have sex with a woman, specifically a nurse, and that he was tired of masturbating.

Ramirez's comments and masturbation in front of people while in the ER, belittled the staff and other women passing by his room. He also commented that his actions were welcome and the

11

recipient of his actions was grateful, which increased the anxiety and suffering of ER staff. The nature and quality of the comments and conduct reflected an ongoing indifference to the harm he caused from assaulting Wilkinson. Because sufficient evidence supports the jury's special verdict that Ramirez displayed an egregious lack of remorse beyond a reasonable doubt, Ramirez's claim fails. Thus, we affirm the jury's special verdict.

### III. LFOs

Ramirez argues for the first time on appeal that the sentencing court failed to make an adequate inquiry into his ability to pay before imposing discretionary LFO's as required under *Blazina*.[3] We disagree.

Appellate courts "may refuse to review any claim of error which was not raised in the trial court," and we are not required to reach this challenge here because Ramirez did not object at trial. RAP 2.5(a). We may also exercise our discretion to reach *Blazina*-based challenges to discretionary LFOs for the first time on appeal. *Blazina*, 182 Wn.2d at 835. Here, we choose to exercise our discretion to review Ramirez's discretionary LFOs.

We review a decision to impose discretionary LFOs for an abuse of discretion. *State v. Clark*, 191 Wn. App. 369, 372, 362 P.3d 309 (2015). A decision is an abuse of discretion when it is exercised on untenable grounds or for untenable reasons. *Clark,* 191 Wn. App. at 372. Before imposing discretionary LFOs, the court must make an individualized inquiry into the defendant's present and future ability to pay LFOs. RCW 10.01.160(3); *Blazina*, 182 Wn.2d at 837-38. "In

---

[3] *State v. Blazina*, 182 Wn.2d 827, 837-38, 344 P.3d 680 (2015).

determining the amount and the method of payment of costs, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose." RCW 10.01.160(3). The court must conduct an adequate inquiry[4] by considering factors including whether the defendant meets the standard for indigency under GR 34, the length of incarceration, and the defendant's other debts, including restitution. *Blazina*, 182 Wn.2d at 838-39.

Here, the court considered that Ramirez had recently been released from custody, was working in a minimum wage job, and had been paying his household bills. Ramirez also told the court that he had opened a bank account for the first time in his life and "was just getting on track," II VRP at 360. He added that although he was working a minimum wage job "it was fine because it took care of everything." II VRP at 363. Thus, we hold that the court conducted an adequate individualized inquiry and did not err in imposing the discretionary LFOs.

## IV. SAG

In his SAG, Ramirez claims that the jury did not understand "the right story of what happened" to him. SAG, Ground 1. He cites to his trial testimony that he was given an unknown substance that made him hallucinate, and argues that he did not receive any tests or treatment at the hospital. Here, Ramirez fails to identify any specific right that was violated related to his first SAG claim. Because Ramirez testified, the jury was able to assess his credibility and the weight

---

[4] Whether or not a trial court makes an individualized inquiry is reviewed de novo; however, if the court does make an inquiry, then we review a trial court's imposition of discretionary LFO's for an abuse of discretion.

of his testimony. Thus, he was able to argue his theory that his intoxication prevented him from forming the intent to assault Wilkinson.

Ramirez also claims that the absence of a Hispanic juror violated his right to a jury of his peers, and he was not able to assist in selecting the jury which violated his right to a fair trial.

We review constitutional claims de novo. *State v. Lynch*, 178 Wn.2d 487, 491, 309 P.3d 482 (2013). The United States Constitution, and the Washington State Constitution guarantee persons accused of a crime the right to a fair trial. U.S. CONST. amends. V, XIV; WASH. CONST. art. I § 3; *State v. Statler*, 160 Wn. App. 622, 637, 248 P.3d 165, 172 (2011). Further, our Supreme Court has held that a criminal defendant has a Sixth Amendment right to a trial by a jury of one's peers drawn from a source fairly representative of the community. *State v. Rupe,* 108 Wn.2d 734, 746, 743 P.2d 210 (1987). Thus, we review the denial of a right to a jury of one's peers and a right to a fair trial de novo. "The absence of any particular group of people on a jury does not violate a defendant's right to a jury of his peers, unless there are circumstances indicating purposeful discriminatory exclusion." *State v. Barron*, 139 Wn. App. 266, 280, 160 P.3d 1077 (2007). "Whether to keep a prospective juror on the jury panel or whether to dismiss a juror often is based on the trial counsel's experience, intuition, strategy, and discretion." *State v. Lawler*, 194 Wn. App. 275, 285, 374 P.3d 278, *review denied,* 186 Wn.2d 1020 (2016).

Ramirez cites no evidence of discriminatory exclusion in the selection of the jury, and jury selection is a strategic decision within the purview of defense counsel. Therefore, Ramirez's right to present a defense to a jury of his peers and right to a fair trial were not violated. Thus, we hold that his SAG claims have no merit.

No. 48705-5-II

We affirm.[5]

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, J.

I concur:

MELNICK, J.

---

[5] Ramirez also requests that we decline to impose appellate costs. We refer the issue of appellate costs to a commissioner or clerk of this court under RAP 14.2. Accordingly, a commissioner of this court will consider whether to award appellate costs if the State files a cost bill and the defendant objects to it.

BJORGEN, C.J. (dissenting) — Whether a trial court made an adequate inquiry into a defendant's ability to pay discretionary legal financial obligations (LFOs) should be reviewed de novo, not for an abuse of discretion. Under a de novo review, the trial court's consideration of David Ramirez's ability to pay LFOs fell short of the standards mandated by *State v. Blazina*, 182 Wn.2d 827, 344 P.3d 680 (2015). Therefore, I would reverse the imposition of LFOs and remand for the trial court to determine whether LFOs should be imposed, following the standards in *Blazina*.

The majority opinion cites *State v. Clark*, 191 Wn. App. 369, 372, 362 P.3d 309 (2015), for the proposition that we review a decision to impose discretionary LFOs for an abuse of discretion. The *Clark* court, however, stated this proposition in the context of deciding whether it should exercise its own discretion to reach Clark's LFO challenge. *Clark*, 191 Wn. App. at 372. To make that decision, the *Clark* court first needed to decide whether a $500 fine imposed under RCW 9A.20.021 was a cost that could be challenged as a discretionary LFO. *Clark*, 191 Wn. App. at 372. To answer that question, the court engaged in a straightforward de novo legal analysis and determined that this fine was not "a court cost subject to the strictures of RCW 10.01.160(3)" and that the trial court was therefore not required to conduct an inquiry into the defendant's ability to pay it. *Clark*, 191 Wn. App. at 376. Thus, *Clark* cannot be read to stand for a general rule that the ability to pay LFOs under *Blazina* is reviewed for an abuse of discretion.

*Clark*, however, did cite *State v. Bertrand* and *State v. Baldwin* for the rule that "[t]he trial court's factual determination concerning a defendant's resources and ability to pay is reviewed under the 'clearly erroneous' standard." *Clark*, 191 Wn. App. at 372 (quoting *State v. Bertrand*, 165 Wn. App. 393, 403-04, 267 P.3d 511 (2011)); *State v. Baldwin*, 63 Wn. App. 303, 312, 818

16

P.2d 1116 (1991). *Baldwin*, though, relied in part on the rule, discredited in *Blazina*, *see* 182 Wn.2d at 832 n.1, that the meaningful time to evaluate a defendant's ability to pay is at the time of collection. *Baldwin*, 63 Wn. App. at 310-11. Further, the information in the presentence report relied on by the *Baldwin* court fell well short of the inquiry now demanded by *Blazina*. *Bertrand*, in turn, held that the trial court's finding that the defendant had the ability to pay LFOs was clearly erroneous because it lacked support in the record.

Whatever uncertainty may lie in these pre-*Blazina* decisions, they and *Clark* are clear that we do not review the determination of ability to pay for an abuse of discretion. Ramirez's challenge, though, is to the *adequacy* of the trial court's inquiry into his ability to pay. This issue has a factual side, the determination of what in fact the court considered and, after *Blazina*, a legal facet, the determination whether the court's consideration complied with the requirements of *Blazina*. The factual side may, as here, often be decided simply by examining the record. The heart of the issue on this appeal revolves instead around whether the inquiry complied with the requirements of *Blazina*, an unalloyed legal question. As with *Clark*'s decision whether a fine under RCW 9A.20.021 can be challenged as an LFO, the decision whether the trial court's inquiry was adequate under *Blazina* should be reviewed as legal questions typically are, de novo. Anything more deferential would risk the robust and consistent implementation of *Blazina* that the importance of its principles demands.

Turning to the adequacy of the inquiry into ability to pay, *Blazina* held that

[t]he record must reflect that the trial court made an individualized inquiry into the defendant's current and future ability to pay. Within this inquiry, the court must also consider important factors, as amici suggest, such as incarceration and a defendant's other debts, including restitution, when determining a defendant's ability to pay.

182 Wn.2d at 838. The information elicited about Ramirez's financial status was that he was working a minimum wage job at Weyerhaeuser as "a temporary service team," was paying all the household bills, and had opened a bank account for the first time in his life.

This data, admittedly, is individualized in that it refers to Ramirez. *Blazina*, though, rejected rote or formulaic treatment of this inquiry, such as reliance on boilerplate findings. *Blazina*, 182 Wn.2d at 838. Instead, the court recognized that assessing LFOs on those without the reasonable ability to pay them can shackle defendants to the criminal justice system long after their release and raise temptations to reoffend that our law is designed to still. *See Blazina*, 182 Wn.2d at 836-37. To avoid this damage, *Blazina* required an effective inquiry and categorically stated that in this inquiry, "the court must also consider important factors, as amici suggest, such as incarceration and a defendant's other debts, including restitution, when determining a defendant's ability to pay." *Blazina*, 182 Wn.2d at 838.

The record does not reflect that the trial court inquired into Ramirez's debts, education or work experience. It does reflect that Ramirez had opened a bank account, but is devoid of any information about its size. The only information about his debts was his declaration on his motion for an order of indigency, granted by the court, that he had no income or assets and owed more than $10,000. Thus, the court's cursory inquiry fails to include mandatory elements established by *Blazina* and only reinforces the vicious circle that *Blazina* was designed to end. The consequences of the inadequate inquiry were compounded by the imposition of a payment rate of $25 per month. Our Supreme Court has recognized that on average, a person who pays $25 per

month toward their LFOs at the statutory interest rate will owe the state more 10 years after conviction than when the LFOs were initially assessed. *Blazina*, 182 Wn.2d at 836.

Finally, in addition to its strong and precise directives, the Supreme Court in *Blazina* held that if "someone does meet the GR 34 standard for indigency, courts should seriously question that person's ability to pay LFOs." *Blazina*, 182 Wn.2d at 839. Ramirez was found indigent. However, instead of respecting the admonition of GR 34, the court's inquiry failed to ask about the specific features required by *Blazina* and imposed payments that would only increase his debt if he made them. In no manner can this be deemed serious questioning of Ramirez's ability to pay.

For these reasons, I would, under de novo review, reverse the imposition of LFOs and remand for the trial court to determine whether LFOs should be imposed, following the standards in *Blazina*.

Bjorgen, C.J.