# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
# DIVISION ONE

| | |
|---|---|
| SCOTT HODGES,<br><br>    Appellant,<br><br>    v.<br><br>KARYNN PAULY,<br><br>    Respondent. | No. 80949-1-I<br><br>ORDER DENYING MOTION FOR RECONSIDERATION AND WITHDRAWING AND SUBSTITUTING OPINION |

The appellant, Scott Hodges, has filed a motion for reconsideration of the opinion filed on April 19, 2021.  The court has determined that the motion should be denied, but the opinion should be withdrawn, and a substitute opinion filed; now, therefore, it is hereby

ORDERED that the motion for reconsideration is denied; and it is further

ORDERED that the opinion filed on April 19, 2021 is withdrawn; and it is further

ORDERED that a substitute unpublished opinion shall be filed.

_Andrus, A.C.J._

_Coburn, J._                    _Chun, J._

THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

SCOTT HODGES,                        )          No. 80949-1-I
                                     )
              Appellant,             )          DIVISION ONE
                                     )
      v.                             )          UNPUBLISHED OPINION
                                     )
KARYNN PAULY,                        )
                                     )
              Respondent.            )
_____ )

ANDRUS, A.C.J. — Scott Hodges appeals a domestic violence protection order (DVPO) protecting his former girlfriend, Karynn Pauly, an order to surrender weapons, and court-ordered domestic violence treatment. Hodges argues he did not commit domestic violence because his actions were the result of an illness, not an intent to inflict fear on Pauly. He also maintains he should not be required to surrender weapons because he presented no credible threat to Pauly. Finally, Hodges contends the DVPO process violated his right to procedural due process and the court-ordered DV treatment violates his free speech rights. We reject his arguments and affirm.

Citations and pin cites are based on the Westlaw online version of the cited material.

FACTS

Karynn Pauly met Scott Hodges in February 2017 and the two dated until April 2018, when Pauly ended the relationship after witnessing several violent outbursts by Hodges.

In February 2018, when Pauly and Hodges were together in a parking garage, Hodges became enraged and kicked out the taillights of three cars, later blaming her for triggering his conduct. In another instance, Hodges threw a backpack across Pauly's bedroom with such force that he dented a closet door and knocked it off its hinges.

This pattern culminated in April 2018, when Hodges subjected Pauly to seven hours of destructive behavior. During the incident, he yelled at Pauly, refused to allow her to go to sleep, broke her dishes and glasses, and threw a beer bottle across her bedroom, drenching her, the bed, and walls in liquid. The next morning, after becoming locked out of Pauly's apartment, Hodges hit the door so forcefully while trying to get back in that he cracked the door frame, jammed the bolt and trapped Pauly inside. She was so frightened she did not go to work for several days. Pauly then informed the couple's therapist that she wanted to end the relationship and no longer intended to participate in joint therapy with Hodges.

A week later, Pauly came home from work around midnight to find Hodges waiting for her in front of her building. Pauly told him that their relationship was not healthy and she did not want to see him anymore. Over the next several months, Hodges wrote Pauly several, often lengthy, letters that he left on her doorstep, sometimes with packages and flowers. In these letters, Hodges acknowledged his

behavior was threatening, erratic and out of control. He also admitted knowing "my behavior scared you and it damaged your feeling of safety." Pauly did not respond to Hodges's gestures, hoping he would eventually cease contact.

On the evenings of February 26 and April 11, 2019, Hodges again came to Pauly's apartment uninvited and knocked on her door. Both times, Pauly told him to stop coming to her apartment. Pauly became frightened when Hodges ignored her entreaties to leave. During the April 11 incident, Pauly again explained that it was inappropriate for him to continue contacting her given that the relationship had ended a long time ago. Hodges responded that he did not think they had concluded the subject. Pauly's body flooded with adrenaline and she started shaking. She told him if he did not leave, she would call the police. Pauly's new partner, at Pauly's home at the time, refused to accept items Hodges wanted to give to Pauly and succeeded in locking the door. After this incident, Pauly filed a police report.

Pauly filed a petition for a DVPO on April 15, 2019. In her petition, Pauly described the fear she experienced and the anxiety with which she had struggled, and the treatment she had sought for panic attacks. The court granted Pauly a temporary restraining order on the same date. Once Pauly served Hodges with the temporary order, he retained counsel, and sought a continuance of the hearing on Pauly's petition to allow him to obtain copies of any police reports and to submit a written response. The court granted this continuance over Pauly's objection.

Hodges appeared with counsel for a hearing before a superior court commissioner on July 18. The commissioner took testimony from Pauly in which

she described Hodges's escalating violence toward her during the relationship, his refusal to accept her request that he have no contact with her, and the anxiety and fear she felt not knowing when he might show up on her doorstep. Hodges submitted a written declaration in which he corroborated Pauly's account of some of his behavior, but claimed it was attributable to his severe sleep apnea, panic attacks, and the stress of being in a relationship with a woman who, he stated, had an "inability to communicate effectively." Hodges, through counsel, acknowledged that "[h]e may have had aggressive outbursts," but he argued these were not directed at Pauly and her allegations of stalking were simply "an issue of miscommunication." He maintained he did not intend to harm or threaten Pauly and he did not realize Pauly wanted to cease contact with him because she did not communicate that fact clearly until the April 2019 incident. Hodges contended he was "unaware of what [Pauly] wanted. This is a breakdown in communication." Hodges testified that, "had Ms. Pauly been able or willing to communicate to me clearly after May of 2018 what she did or didn't want by way of contact from me, I would have appreciated it, would have known what wishes she wanted me to follow, and we would not be here." He insisted he meant Pauly no harm and did not intend to cause her to have fear of any kind.

Pauly disputed Hodges's version of events after their separation. She testified she had an in-person conversation with Hodges on May 8, 2018, in which she put him on notice of her desire to terminate contact with him. She also testified she informed him a second time on February 26, 2019, when he showed up on her doorstep and "told him in no uncertain terms at that point that . . . no relationship

was desired and that any further contact was inappropriate, and he still showed up a month later." She also pointed out that despite Hodges sending her seven letters spaced out over a calendar year, she did not attempt in any way to communicate with him because the letters reflected his knowledge and recognition that his behavior had scared her.

The commissioner found that Hodges's violent conduct and repeated uninvited appearances at Pauly's apartment placed her in reasonable fear of imminent harm and therefore constituted domestic violence. The commissioner further found that Hodges represented a credible threat to Pauly and entered a one year DVPO. The commissioner ordered Hodges to participate in a state-certified domestic violence perpetrator treatment program out of concern that his current therapist was not addressing his domestic violence issues. Based on the credible threat finding, the commissioner entered an order requiring Hodges to surrender any weapons he had in his possession.

Hodges moved to revise the commissioner's decision. The trial court, reviewing the record before the commissioner de novo, affirmed the findings and denied the motion. Hodges appeals.

## ANALYSIS

A. Definition of Domestic Violence

Hodges argues the trial court erred in granting the DVPO because he never assaulted Pauly and she presented no evidence he intended to inflict fear of any physical harm. We disagree with Hodges's interpretation of RCW 26.50.010(3) as well as his characterization of the evidence before the trial court.

- 5 -

First, RCW 26.50.010(3) defines domestic violence as "[p]hysical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury or assault, sexual assault, or stalking as defined in RCW 9A.46.110 of one intimate partner by another intimate partner." The trial court found that Pauly proved "by a preponderance of the evidence that she has a present fear of harm based on Mr. Hodges past violent behavior." Hodges does not challenge this finding. He instead argues, in the absence of any actual physical injury or assault, a DVPO cannot be issued unless a petitioner proves a respondent acted with the specific intent to inflict fear of physical harm.

Although we generally review a superior court's decision to grant a protection order for abuse of discretion, In re Marriage of Stewart, 133 Wn. App. 545, 550, 137 P.3d 25 (2006), Hodges raises a question of statutory interpretation which we review de novo. Dep't of Ecology v. Campbell & Gwinn, L.L.C., 146 Wn.2d 1, 9, 43 P.3d 4 (2002).

The primary goal of statutory interpretation is to determine and give effect to the legislature's intent. Jametsky v. Olsen, 179 Wn.2d 756, 762, 317 P.3d 1003 (2014). To determine legislative intent, we first look to the plain language of the statute. Id. If a statute is unambiguous, Washington courts apply the statute's plain meaning as an expression of legislative intent without considering other sources of such intent. Id. at 762.

Hodges argues the phrase "infliction of fear" must be interpreted to require proof of intent to cause fear. But the dictionary definitions of "inflict" or "infliction" do not support such an interpretation. To "inflict" is to "cause (something damaging

- 6 -

or painful) to be endured." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1160 (2002). One can certainly cause another to endure something damaging or painful without intending to do so.

Our Supreme Court has rejected a similarly limiting interpretation of the definition of domestic violence in Rodriguez v. Zavala, 188 Wn.2d 586, 398 P.3d 1071 (2017). In that case, the Supreme Court reversed this court's interpretation that fear of imminent harm referred only to "the fear possessed by the one seeking protection, not fear that another family member has of harm to the one for whom protection is sought." Id. at 592. The Supreme Court concluded that this interpretation was "unnecessarily narrow" and went against the plain and unambiguous language of the statute indicating that domestic violence includes the infliction of fear of harm between family members generally. Id.

As in Rodriguez, Hodges seeks to append a restricting element that is not supported by the plain language of the statute. The meaning of RCW 26.50.010 is unambiguous. One commits domestic violence when one inflicts fear of physical harm on one's intimate partner. This court has repeatedly held that a petitioner's fear of harm is sufficient basis for a DVPO. See Maldonado v. Maldonado, 197 Wn. App. 779, 791, 391 P.3d 546 (2017) ("[e]ven when there is no evidence of a direct assault on a child, fear of violence is a form of domestic violence that will support an order for protection"); Stewart at 551 (children's fear of future assault on their mother constituted domestic violence); Spence v. Kaminski, 103 Wn. App. 325, 332-33, 12 P.3d 1030 (2000) (trial court's finding that respondent had

threatened petitioner in the past and that the petitioner continues to be afraid of petitioner was adequate grounds for permanent protection order).

And despite Hodges's characterization of his conduct as mere "illness-induced destructive acts," Pauly offered circumstantial evidence that Hodges intended to cause her to fear violence at his hand. A trier of fact "may infer . . . intent from . . . conduct where it is plainly indicated as a matter of logical probability. This includes inferring or permissibly presuming that a defendant intends the natural and probable consequences of his or her acts." State v. Bea, 162 Wn. App. 570, 579, 254 P.3d 948 (2011). Pauly presented evidence that Hodges yelled and screamed at her for a seven-hour period, refused to let her sleep, and then after she went to bed, woke her up by throwing a beer bottle across her bedroom showering her, the bed, and her walls in liquid. A reasonable trier of fact could infer intent to inflict fear of bodily harm from the nature and duration of Hodges's aggressive actions.

The trial court therefore did not err in granting the DVPO.

B. Credible Threat Finding

Hodges next argues that the trial court erred in finding that he presents a credible threat to Pauly and ordering him to surrender weapons. A court must enter an order to surrender weapons in connection with a DVPO if that court finds the respondent "represents a credible threat to the physical safety" of the individual protected by the DVPO. RCW 9.41.800(3)(c)(i).

Hodges first maintains that our standard of review should be de novo because the credible threat finding is a conclusion of law. We disagree. "If a

determination concerns whether the evidence showed that something occurred or existed, it is properly labeled a finding of fact, but if a determination is made by a process of legal reasoning from, or interpretation of the legal significance of, the evidentiary facts, it is a conclusion of law." Goodeill v. Madison Real Estate, 191 Wn. App. 88, 99, 362 P.3d 202 (2015) (citing Moulden & Sons, Inc. v. Osaka Landscaping & Nursery, Inc., 21 Wn. App. 194, 197 n. 5, 584 P.2d 968 (1978)).

In contexts other than the Domestic Violence Protection Act (DVPA),[1] we have held that whether a person's past statements were threats and perceived as threats are questions of fact. Lawter v. Emp't Sec. Dep't, 73 Wn. App. 327, 333, 869 P.2d 102 (1994). We have also held that whether a person presents a danger in the future based on past threatening conduct is also a question of fact. State v. Wood, 57 Wn. App. 792, 799, fn. 4, 790 P.2d 220 (1990). The DVPA presents a trial court with an analogous inquiry. Whether Hodges presents a credible threat of physical harm under the DVPA requires the trier of fact to determine whether his prior conduct and statements evidence a risk of future dangerousness. Although the finding does have legal significance in that it requires the court to enter a surrender weapons order, the court does not interpret the legal significance of this finding; it only decides whether the threat in fact exists. It is therefore a finding of fact that we review for substantial evidence. In re Dependency of Schermer, 161 Wn.2d 927, 940, 169 P.3d 452 (2007).

---

[1] Ch. 26.50 RCW.

Hodges next maintains that substantial evidence does not support the trial court's finding that he represents a credible threat to Pauly. In its oral ruling, the trial court stated that

> I do conclude that Ms. Pauly did witness Mr. Hodges engage in violent acts in the past, and that having witnessed those acts, combined with Mr. Hodges showing up at Ms. Pauly's front door late at night in April 2019, that was enough, that is enough for me to conclude that. . . . Mr. Hodges presents a credible threat to physical safety of Ms. Pauly.

Hodges does not dispute that Pauly witnessed him engage in violent acts or that he repeatedly showed up at her apartment uninvited late at night. Instead, Hodges argues that he never intended to harm Pauly and that his actions were caused by his ongoing medical issues.

But this argument does little to counter the weight of evidence supporting the trial court's determination. Regardless of the cause and intent behind Hodges's actions, Pauly's undisputed testimony that she was repeatedly subjected to his threatening and abusive behavior, that she repeatedly told him to have no further contact with her, that he persistently showed up on her doorstep late at night, and that he left her several letters suggesting his intent to continue a relationship she did not want, supports the conclusion that Hodges represents a credible threat to her. After making this finding, the trial court was obligated to enter the surrender weapons order and therefore did not err in doing so.

C.  Domestic Violence Treatment Program

Hodges next argues that the trial court abused its discretion when it ordered he participate in a domestic violence perpetrators treatment program. We disagree.

Hodges contends that the court's order was based on untenable grounds because his "episodes of violence were illness-based, not part of a pattern of behavioral domestic violence" and he "was already receiving appropriate medical and mental health treatments to prevent future episodes of violence." Hodges supports his argument by citing to the Washington Domestic Violence Manual for Judges (DV Manual), which states that "specialized domestic violence counseling is contraindicated for illness-based violence. In such cases, the violence can be more effectively managed by appropriate external constraints and by appropriate medical or mental health intervention." WASH. STATE SUPREME COURT GENDER & JUSTICE COMM'N, ADMIN. OFFICE OF COURTS, DOMESTIC VIOLENCE BENCH GUIDE FOR JUDICIAL OFFICERS 2-27 (June 2016), http://www.courts.wa.gov/content/manuals/domViol/Complete%20Manual%2020 15.pdf#search=domestic%20violence%20manual%20for%20judges. He maintains that domestic violence treatment is inappropriate for him. This argument is unconvincing.

First, state regulations now require that a participant in a domestic violence treatment program "must complete an individual interview and behavioral assessment with a certified program prior to starting any level of treatment." WAC 388-60B-0400(1). The purpose of this assessment is to determine the level of risk, needs, and responsivity for the participant as well as the level of treatment required and the creation of an individualized treatment plan. WAC 388-60B-0400(2). As part of this process, assessors screen for mental health indicators and are authorized to recommend no domestic violence intervention treatment where

appropriate. WAC 388-60B-0400(10) and (19)(f). This procedure minimizes the risk that Hodges will receive domestic violence treatment that is unnecessary or unhelpful.

Second, Hodges has offered no evidence, other than his own assertions that his aggressive, threatening behavior is "illness-based domestic violence" as defined in the DV Manual. The DV Manual cautions that this type of domestic violence is uncommon, but recognizes that "[a] very small percentage of violence against intimates is mislabeled as domestic violence when actually it is caused by organic or psychotic impairments." DOMESTIC VIOLENCE BENCH GUIDE, supra, at 2-26. The manual provides an illustrative list of impairments causing illness-based domestic violence including Alzheimer's disease, Huntington's chorea, and psychosis. Id. The manual makes no mention of sleep apnea or PTSD. Moreover, the manual states that perpetrators of domestic violence often externalize responsibility to factors supposedly outside of their control, including PTSD. Id. at 2-37. Ultimately, the trial court is in the best position to determine whether a respondent's actions are the result of an illness not amenable to domestic violence treatment.

The record indicates that the commissioner carefully considered the evidence of Hodges's medical issues and the type of treatment he was receiving from his long-term therapist. After weighing this evidence, the commissioner exercised her discretion to order Hodges to participate in a treatment program to specifically address domestic violence that did not appear to be a part of his

existing therapist's plan of treatment. The trial court did not err in ordering such treatment.

D.     Court-Ordered DV Treatment as Compelled Speech

Hodges next argues that court-ordered participation in a domestic violence treatment program constitutes "compelled speech" in violation of his First Amendment rights. He argues that this requirement in the DVPO will force him "to express opinions with which [he] might not agree." We assume, although Hodges does not explicitly say so, that one of the ideas he disagrees with is the trial court's finding that he committed domestic violence.

We will review Hodges's constitutional challenge de novo. Shoop v. Kittitas County, 149 Wn.2d 29, 33, 65 P.3d 1194 (2003); Aiken v. Aiken, 187 Wn.2d 491, 501, 387 P.3d 680 (2017).

The freedom of speech contained in the First Amendment to the United States Constitution "includes both the right to speak freely and the right to refrain from speaking at all." Wooley v. Maynard, 430 U.S. 705, 714, 97 S. Ct. 1428, 51 L. Ed. 2d 752 (1977). "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command." Janus v. Am. Fed'n Mun. Emps., Council 31, 138 S. Ct. 2448, 2463, 201 L. Ed. 2d 924 (2018). It is this line of cases on which Hodges relies for his challenge here.

Hodges cites no authority for the proposition that court-mandated treatment constitutes unlawful compelled speech when the treatment arose out of a judicial determination that Hodges perpetrated domestic violence. We are not required to

search for authorities and assume that counsel, after diligent efforts, has found none. City of Seattle v. Muldrew, 69 Wn.2d 877, 420 P.2d 702 (1966).

It is somewhat speculative that Hodges will be "compelled" to admit he committed domestic violence or else be forced to engage in protected expressive conduct or speech as a part of his treatment program. However, we assume without holding, that court-ordered domestic violence treatment involves some "expression" protected by the First Amendment. See State v. Arlene's Flowers, Inc., 193 Wn.2d 469, 511, 441 P.3d 1203 (2019) (a party alleging a violation of the First Amendment based on compelled speech "must first demonstrate that the conduct at issue . . . amounts to 'expression' protected by the First Amendment"). WAC 388-60B-0370(3)(d) does require a participant in a domestic violence treatment program to "actively participate in treatment, including sharing personal experiences, values, and attitudes."

The next inquiry is whether the mandated treatment is a "content-based" or "content-neutral" regulation of speech. Nat'l Inst. of Family and Life Advocates v. Becerra, 138 S. Ct. 2361, 2371, 201 L. Ed. 2d 835 (2018). Content-based regulations "target speech based on its communicative content." Reed v. Town of Gilbert, 576 U.S. 155, 135 S. Ct. 2218, 2226, 192 L. Ed. 2d 236 (2015). A speech regulation targeted at a "specific subject matter" will be deemed content-based even if it does not discriminate among viewpoints within that subject matter. Reed, 135 S. Ct. at 2230. Laws regulating the content of speech are presumptively unconstitutional unless they are narrowly tailored to serve compelling government interests. Becerra, 138 S. Ct. at 2371. Although neither party offers any argument

on whether court-mandated domestic violence treatment programs are content-based or content-neutral, we assume here that because treatment is targeted at a specific subject matter, it falls into the category of regulating content-based speech and will apply strict scrutiny.

Under this test, we conclude court-mandated domestic violence treatment is narrowly tailored to advance a compelling government interest. First, Washington's legislature and state Supreme Court have both recognized that the government has a compelling interest in preventing domestic violence and abuse. Gourley v. Gourley, 158 Wn.2d 460, 468, 145 P.3d 1185 (2006); LAWS OF 1993, ch. 350, § 1 (recognizing that "domestic violence is a problem of immense proportions affecting individuals as well as communities. . . . Domestic violence costs include the loss of lives as well as millions of dollars each year in the state of Washington for health care, absence from work, and services to children. The crisis is growing.")

The court-ordered treatment is narrowly tailored to advance this compelling interest. First, RCW 26.50.060(1)(e) gives courts the discretion to "[o]rder the respondent to participate in a domestic violence perpetrator treatment program approved under RCW 26.50.150." RCW 26.50.150, in turn, requires domestic violence treatment programs to be certified by the Department of Social and Health Services and meet minimum standards, the primary focus of which is "ending the violence, holding the perpetrator accountable for his or her violence, and changing his or her behavior." RCW 26.50.150(4). This focus ties back directly to the compelling interest in preventing domestic violence.

Second, the court ordered Hodges to attend this treatment only after conducting a contested evidentiary hearing during which he was represented by counsel and only after finding that he had in fact committed domestic violence.

Third, Hodges had the opportunity to argue to the commissioner and subsequently on revision before the trial court that domestic violence treatment was not appropriate for him. Moreover, the governing WAC provisions provide for an intake process that tailors an individualized treatment plan and minimizes the likelihood that Hodges will receive treatment that is outside the legislature's stated objective of preventing domestic violence and abuse. WAC 388-60B-0400.

We conclude under these circumstances, the court order requiring Hodges to participate in domestic violence treatment survives strict scrutiny.

E.    Procedural Due Process

Hodges next argues that the trial court's orders violated his procedural due process rights. We reject this contention as well.

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). The level of procedural protection required varies based on circumstance. Id. at 334.

Our Supreme Court has upheld the DVPA against procedural due process challenges. See Aiken, 187 Wn.2d at 504-05 (due process does not require trial court to allow parent to cross examine child regarding alleged domestic violence); Gourley, 158 Wn.2d at 467 (same). Hodges seeks to distinguish Gouley and Aiken by arguing that, unlike in the parenting context where the petitioner and respondent

have competing equal rights to the control and care of their children, Pauly has "no offsetting rights over [Hodges's] liberty or right to bear arms." He argues that "[h]ere, where firearm restrictions or DV treatment requirements are at stake, due process should require more." But our due process analysis does not pit Hodges's rights to bear arms against Pauly's right to be free from domestic violence. We look at Hodges's interests and those of the government in protecting victims:

> In evaluating the process due in a particular situation, [Washington courts] consider (1) the private interest impacted by the government action, (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and (3) the government interest, including the additional burden that added procedural safeguards would entail.

Aiken, 187 Wn.2d at 501-02 (quoting Mathews, 424 U.S. at 335). In both Aiken and Gourley, despite recognizing the respondents' fundamental right to make decisions concerning the care, custody, and control of their children, the Supreme Court concluded that "[t]he government has an equally compelling interest in protecting children and preventing domestic violence or abuse." Aiken, 187 Wn.2d at 502-03 (citing Gourley, 158 Wn.2d at 468). This interest is anchored in the legislature's explicit findings in enacting provisions of the DVPA. See LAWS OF 1993, ch. 350, § 1. The court concluded in both cases that the parent's rights over their children does not outweigh the government's compelling interest in preventing domestic violence. Aiken, 187 Wn.2d at 502-03; Gourley, 158 Wn.2d at 468.

We therefore conclude, as the Supreme Court did in Aiken and Gourley, that the first and third factors must be balanced by a consideration of the

procedures employed by the government and the risk that Hodges's interests were erroneously deprived. Gourley, 158 Wn.2d at 468.

The DVPA provides several procedural protections for respondents. Aiken, 187 Wn.2d at 502; Gourley, 158 Wn.2d at 468-69. The provisions of the DVPA

> satisfy the two fundamental requirements of due process—notice and a meaningful opportunity to be heard by a neutral decision maker. The procedural safeguards include: (1) a petition to the court setting forth facts under oath; (2) notice to the respondent; (3) a hearing before a judicial officer where the petitioner and respondent may testify; (4) the opportunity to file a motion to modify a protection order; (5) a requirement that a judicial officer issue any order; and (6) the right to appeal.

State v. Karas, 108 Wn. App. 692, 699, 32 P.3d 1016 (2001) (citing Spence v. Kaminski, 103 Wn. App. 325, 334, 12 P.3d 1030 (2000). Each of these procedural safeguards was provided in the present case to protect Hodge's due process rights.

Hodges was represented by counsel at every stage of this proceeding. He was afforded adequate notice and the court granted him a five-week continuance to respond to Pauly's petition. Hodges presented his argument via a declaration and exhibits, and volunteered testimony at the hearing. He did not request the opportunity to cross examine Pauly. After the commissioner's ruling, Hodges filed a motion for revision and again had the opportunity to be heard in front of a trial court.

Moreover, the risk of the erroneous deprivation of Hodges's constitutional interests is mitigated by the DVPO's limited one-year term. See Mathews, 424 U.S. at 341 (holding that the possible length of wrongful deprivation of a property

- 18 -

interest is an important factor in assessing the impact of official action on the private interests).

Hodges has failed to show how these numerous safeguards were so deficient as to deprive him of due process. Our Supreme Court has repeatedly upheld these procedural protections in the DVPO context and we adhere to those holdings here.

F.     Appearance of Fairness

Hodges lastly argues that the DVPO process violates the appearance of fairness doctrine. We disagree.

"Under the appearance of fairness doctrine, a judicial proceeding is valid only if a reasonably prudent, disinterested observer would conclude that the parties received a fair, impartial and neutral hearing." State v. Gamble, 168 Wn.2d 161, 187, 225 P.3d 973 (2010). The doctrine requires that the judge not only be impartial, but also appear to be impartial. Id. (citing State v. Madry, 8 Wn. App. 61, 70, 504 P.2d 1156 (1972)). A successful claim under the doctrine requires evidence of actual or potential bias on the part of the judge. State v. Chamberlin, 161 Wn.2d 30, 37, 162 P.3d 389 (2007).

Hodges cites a number of provisions of the DVPA, arguing that they create a process which favors petitioners over respondents. The fundamental problem with Hodges's argument is that he does not provide evidence of bias on the part of any judicial officer, but instead asserts bias of the legislature in drafting the DVPA. The appearance of fairness doctrine does not apply to legislative actions. See Barry v. Johns, 82 Wn. App. 865, 920 P.2d 222 (1996).

Hodges also argues the commissioner who granted Pauly's ex parte DVPO, violated the appearance of fairness doctrine by asking Pauly several leading questions during the hearing. But the commissioner's efforts to elicit information from a pro se petitioner does not constitute evidence of bias. Judges are permitted "to make reasonable accommodations to ensure pro se litigants the opportunity to have their matters fairly heard" without violating the rule of partiality and fairness. CJC 2.2, comment 4. These actions do not violate the appearance of fairness.

G.      Attorney Fees

Pauly requests attorney fees for this appeal. An appellate court may award attorney fees where allowed by statute, rule or contract. Aiken, 187 Wn.2d at 506. Under RCW 26.50.060(1)(g), the court has the discretion to require a respondent in a DVPA proceeding to pay reasonable attorney fees. Id. Because Pauly is the prevailing party, we exercise our discretion and grant her request for reasonable attorney fees and costs on appeal subject to her compliance with RAP 18.1.

Affirmed.

_Andrus, A.C.J._

WE CONCUR:

_Coburn, J._          _Chun, J._